704 So.2d 800 (1997)
STATE of Louisiana
v.
Vashon KELLY, sentenced as "Vashon J. Kelly", a/k/a Vashon Kelly, a/k/a Vashon Joseph Kelly, a/k/a Vasham Kelly.
No. 96-KA-903.
Court of Appeal of Louisiana, Fifth Circuit.
November 12, 1997.
*801 Kevin V. Boshea, New Orleans, for Defendant/Appellant.
Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Assistant District Attorney, Gretna, for Plaintiff/Appellee.
Before WICKER, GOTHARD and DALEY, JJ.
DALEY, Judge.
The defendant was tried and convicted of second-degree murder and attempted second-degree murder. He was sentenced to the mandatory term of life imprisonment for second degree murder and forty-nine (49) years at hard labor for the attempted second degree murder. The court ordered that these sentences run consecutively. Defendant has appealed his sentence and conviction, alleging four assignments of error. For the reasons assigned, we affirm defendant's conviction.

FACTS:
On the night of Friday, August 5, 1994, Laetitia Fageot, Bonnie Giambalvo, Vasham Kelly, and Julius Lucky worked the night shift at the Gourmet Grill and Daiquiri Shop on Veterans Memorial Boulevard in Metairie. Ms. Fageot was the bartender/cashier, Ms. Giambalvo was a waitress, defendant, Mr. Kelly, was a cook, and Mr. Lucky worked as a porter/dishwasher. The restaurant closed at midnight, and the four employees stayed afterwards to perform closing duties.
Ms. Giambalvo clocked out, but waited inside the restaurant for Ms. Fageot in order to escort Ms. Fageot to her car. Ms. Giambalvo testified that, due to an unknown incident earlier in the week, Ms. Fageot was uneasy about being left alone with Mr. Lucky and the defendant. Ms. Giambalvo stated that she had worked with the defendant several times and always felt uncomfortable working with him. She testified that the porter and cook usually left earlier, but that this night "they lingered." She further testified that on this particular night the defendant and Mr. Lucky were very nervous and uptight and whispering to each other. After sweeping the floor and wiping down the counter, Ms. Giambalvo played a video poker machine. Ms. Fageot counted the money in the cash register, tallied the day's sales totals, and prepared a two hundred-dollar "bank" made up of $15 in change, numerous one dollar bills, five dollar bills and ten dollar bills totaling $200 in preparation for the next day's opening. Defendant completed his duties in the kitchen and clocked out at about 12:40 a.m. Mr. Lucky clocked out at about the same time, and then began to mop the front part of the restaurant. Defendant called his girlfriend from a pay telephone outside the restaurant to ask for a ride home.
Defendant then came back into the restaurant and sat next to the jukebox, smoking a cigarette. Ms. Giambalvo turned toward Ms. Fageot to tell her she had won at the video poker game. As she did so, she saw defendant looking at her. Ms. Giambalvo also *802 noted that Mr. Lucky was standing behind her, looking over her shoulder as she played the machine. Seconds later, Mr. Lucky shot Ms. Giambalvo in the back of the head at close range. Ms. Giambalvo survived the gun shot and testified that she heard a loud noise, reached for the back of her head and fell to the floor, becoming unconscious. She did not see the gun before she was shot.
Mr. Lucky then shot Ms. Fageot in the head, fatally wounding her. Defendant left the restaurant, followed by Lucky. Defendant's girlfriend, Dawn Harris, pulled up in front of the restaurant in the couple's Ford Mustang, and the defendant got into the front passenger seat. Lucky got into the back seat, and Harris drove to the apartment she shared with defendant. Lucky went inside with Harris and defendant. Lucky's girlfriend picked him up a short time later. Defendant did not mention the shooting to Ms. Harris or anyone else.
Ms. Giambalvo regained consciousness at approximately 1:00 a.m. on August 6. She was disoriented, and bleeding profusely from the back of her head. She wandered around the restaurant in search of Ms. Fageot, and eventually discovered Fageot's body behind the counter. Ms. Giambalvo called 911. Sergeant Jeffrey Eddy and Deputy Mark Ceravolo of the Jefferson Parish Sheriff's Office were the first officers to arrive at the scene. Although Ms. Giambalvo was conscious, she could only recite her name and address for the officers. She was unable to give them any other information. The officers searched the restaurant for other victims or perpetrators, then called for backup and for ambulances for the victims. Ms. Giambalvo was taken to East Jefferson General Hospital for treatment. Officers recovered two spent .25 caliber Winchester brand bullet casings at the crime scene; one behind a video poker machine, and the other near Laetitia Fageot's feet. The owner of the Gourmet Grill, Ronnie Boyd, testified that he inspected the restaurant after the shootings and found that the "bank" money was missing, although it did not appear that anything else had been taken.
The lead investigator on the case, Detective Philip Ramon of the sheriff's office, testified that after supervising the investigation of the murder scene, he interviewed Ms. Giambalvo at the hospital. Based on the information she gave him, Ramon obtained arrest warrants for the defendant and Mr. Lucky. Defendant was arrested at his daytime place of employment, Corkey's Bar-B-Q, in Metairie. Detective Ramon placed the defendant under arrest and informed him of his Miranda rights. Julius Lucky was arrested later that same day when he arrived for work at the Gourmet Grill. A search was carried out by Detective Ramon, Detective Debbie Labit, and Lieutenant Don English. Having already obtained a search warrant for the defendant's apartment, the officers transported defendant directly to his Division Street apartment after his arrest. Lieutenant Steve Buras remained outside with the defendant. Eighty dollars in cash, consisting of fifty one-dollar bills, three five-dollar bills, and two ten-dollar bills, was found hidden in the dirt of a plant. Officers also recovered two .25 caliber bullets inside a vase and one.25 caliber on the floor. These bullets were CCI brand.
Following the search, the defendant was taken to the detective bureau on Maple Street. Lieutenant Buras advised defendant of his Miranda rights. Defendant waived his rights and gave a recorded statement, denying any knowledge or involvement in the shootings. This statement began at 3:12 p.m. and ended at 3:38 p.m. Defendant gave a second statement at 5:55 p.m. on August 6, 1994, and ending at 6:10. In this second statement, defendant admitted lying in the first statement, and acknowledged that he was present when Mr. Lucky shot the two victims.
Prompted by information given them by Mr. Lucky, officers recovered a bank deposit bag in a drain on Franklin Street in New Orleans. The bag contained Gourmet Grill receipts dated August 5, 1994. Detectives Ramon and Labit and Lieutenant Buras took Mr. Lucky to search an area near the river where Mr. Lucky claimed to have thrown the murder weapon. They were unable to locate the weapon. Two days later, Robert Portwood gave police a gun he had discovered near the Mandeville Street Wharf in New *803 Orleans. Portwood's friend, Bob Devine, turned over the gun's clip. The clip contained two Winchester brand .25 caliber bullets. At trial the parties stipulated that the gun, a .25 caliber semiautomatic pistol, belonged to Julius Lucky's brother.
Louise Walzer, a firearms examiner with the Jefferson Parish Sheriff's Office, was qualified at trial as an expert in firearms examination and analysis. She testified that she received the gun for testing. The weapon was inoperable when she received it, but she was able to make the necessary repairs to render it functional. Ms. Walzer testified that her tests showed the cartridge cases found at the crime scene had markings consistent with the markings on the weapon's barrel and that the markings were "enough and consistent where I could say those two were fired from this weapon." She further testified she could not attempt a match with a projectile removed from Laetitia Fageot's body because the bullet was too damaged. Walzer confirmed, however, that the projectile possessed the "same class characteristics as far as the number, the widths of the grooves and the widths of the lands." Ms. Walzer confirmed that the three CCI brand cartridges found in defendant's apartment were .25 caliber bullets, and that they could be fired from this weapon.
The pathologist who performed the autopsy on Laetitia Fageot's body, Dr. Fraser Mackenzie, testified that Ms. Fageot died of a bullet wound to the brain stem. He further testified that the formation of the wound indicated the shot was fired at close range.
The state's witness, Terrance Chestnut, testified that he and the defendant were assigned to the same jail cell while in the Jefferson Parish Correctional Center for a period of two to three months while defendant awaited trial. Chestnut stated that during that time defendant told him that he and Lucky had planned the Gourmet Grill robbery in advance, but that they did not intend to kill anyone. According to Chestnut, defendant also confided that Mr. Lucky was the gunman.
Defendant took the stand in his own defense. He denied ever having talked to Chestnut about his case and stated that Chestnut was known among the prisoners as a "rat." Defendant testified that Julius Lucky is his cousin, and that he had helped Mr. Lucky to get the job at Gourmet Grill after Lucky was released from prison. Before the summer of 1994, defendant had not seen Mr. Lucky for seven years. Defendant had no prior convictions, and had made plans to attend Southern University in Baton Rouge.
Defendant testified that the shootings at Gourmet Grill were not planned, and that he did not know ahead of time that Mr. Lucky would rob and shoot the two victims. Defendant further testified that he fled the scene of the crime without seeking help or notifying authorities because the shooting shocked him, and because he feared Mr. Lucky would shoot him and Ms. Harris if he did not cooperate. Moreover, he assumed that the victims were both dead, and thus beyond help. He further testified that the money recovered from his potted plant was cash he had saved from tips he earned at work. He had hidden the money because Ms. Harris had a habit of taking his money without first asking his permission. Both the defendant and Ms. Harris testified that the bullets found in their apartment were from a gun they had once owned, but had disposed of long ago.
The defendant's girlfriend, Dawn Harris, testified that she usually picked up the defendant and Julius Lucky from the Gourmet Grill after work. On August 6, the defendant called her and she went to pick him up. She stated that as she drove down Veterans Boulevard to pick up the defendant, she saw defendant walking on the side of the highway, near the Gourmet Grill. She stopped the car and he got in and closed the door. A minute later, Julius Lucky called for them to wait for him. Defendant got out of the two-door car and allowed Mr. Lucky to get into the back seat. Harris testified that there was some "tension" between the defendant and Lucky that night, but that they did not speak about any of the events that took place that night. She stated that they drove straight to the Division Street apartment and Mr. Lucky was picked up about five minutes later by his girlfriend.
*804 The defendant presented a number of character witnesses at trial in support of his defense. Reverend Winston B. Ricks took the stand and testified that he had known the defendant for 15-16 years and that the defendant attended services regularly as a child. Ms. Elsie Adams, a social worker who is also a friend of the defendant's family, testified that she had known the defendant as a child and as he got older. She knew him to be honest and hardworking. Mr. Mike Craddick, a partner of Corky's Bar-B-Q, testified that the defendant had worked for him for one and a half to two years and that he had worked his way up from crew member to catering captain. He described the defendant as one of his top employees.
The jury returned a verdict of guilty of second degree murder and attempted second degree murder, and defendant appeals.

ASSIGNMENT OF ERROR NO. 1
In his first assignment of error the defendant argues that the trial court erred in failing to grant the Motion to Quash filed on behalf of the defendant seeking compliance with the plea agreement made between the state and defense. The defendant asserts that prior to trial in this matter, he and his attorney participated in extensive discussions with prosecutors, during which he gave prosecutors a good deal of information regarding Julius Lucky and the Gourmet Grill shootings, and agreed to testify against Mr. Lucky with the understanding that he would be allowed to plead to the reduced charge of accessory after the fact to murder. The state did not call defendant to testify at the trial of Mr. Lucky and ultimately did not deliver the plea bargain defendant expected. In response the defendant filed a Motion to Quash Indictment and Enforce Plea Agreement.
This motion was heard on April 15, 1996. Defense counsel, Raechelle Vix, argued that for a period of about a year, she and defendant had an understanding with prosecutor Kim McElwee[1] wherein the defendant would testify against Mr. Lucky in exchange for having his charges reduced to accessory after the fact to murder. The alleged agreement was made orally, and was not reduced to writing. Ms. Vix asserted that one week before Mr. Lucky's trial, McElwee informed her that the state was no longer interested in defendant's testimony. Vix argued that in engaging defendant in plea negotiations, the state had compromised his right against self-incrimination, and that the law of contracts required enforcement of the original plea agreement.
In responding, Ms. McElwee conceded that the state had entered into an agreement with defendant by which defendant would testify truthfully at Mr. Lucky's trial in exchange for a reduced charge and lenient sentence. Prosecutors chose to withdraw from the agreement when they learned from defendant's cellmate, Terrance Chestnut, that defendant had confessed to conspiring with Lucky to commit the robbery and shootings. Ms. McElwee argued the following:
All of the information that Vashon Kelly has been giving to the state in these little meetings was a lie, a flat out lie; and besides that, it was information that I already had from other sources ... I haven't received anything that I didn't already have except his lies. His defense about how this went down is nothing but a bunch of lies because Terrance Chestnut has explained to me what Vashon Kelly told him while they were cellmates, which puts him right in the middle of the whole deal ... We talked about a plea if Vashon Kelly testified truthfully at trial. Based on what I learned from Terrance Chestnut, if I put Vashon Kelly on the stand at Julius Lucky's trial, I felt in good faith that I would be suborning perjury.
The trial court denied the Motion to Quash. Defendant then applied for writs to this Court. This Court and the Louisiana Supreme Court denied writs. It is well settled that a denial of a supervisory writ does not bar a defendant from raising on appeal from a final judgment the merits of the issue denied supervisory review. State v. Fontenot, 550 So.2d 179 (La.1989).
*805 The Louisiana Supreme Court has viewed plea agreements or agreements not to prosecute as contracts between the state and the one accused of a crime, and has generally referred to the rules of contract law in determining the validity of such agreements. State v. Louis, 94-0761 (La.11/30/94), 645 So.2d 1144; State v. Nall, 379 So.2d 731, (La.1980). The Supreme Court has further held, however, that a defendant's constitutional right to fairness may be broader than his or her rights under the law of contract. State v. Louis, 645 So.2d at 1148.
A long standing rule of contract law is that consent of both parties is required for a valid contract. Offer and acceptance may be verbal, unless the law dictates that it be in writing. LSA-C.C. Art. 1927. Additionally, the obligation may be dependant upon an uncertain event. LSA-C.C. Art. 1767. Once there is offer and acceptance, the agreement is subject to specific performance. LSA-C.C. Art. 1986. The party seeking specific performance of a contract has the obligation of proving its existence. State v. Louis, 645 So.2d at 1149.
It is clear from the record that there was a verbal contract which provided that the defendant would be charged with a lesser crime if he would testify truthfully at the trial of Julius Lucky. This contract was conditioned on the truthfulness of defendant's testimony at Mr. Lucky's trial. If the defendant did not testify truthfully, then the contract would fail, and the state would be relieved of its obligation under the plea agreement. See State v. Nall, supra; State v. Hackett, 506 So.2d 598 (La.App. 4 Cir.1987). Hence the trial court did not err in failing to grant the Motion to Quash.
Additionally, it should be noted that the state had a confession from Mr. Lucky in which Mr. Lucky admitted to shooting both of the victims, therefore, the testimony of Mr. Kelly was not essential for the state in Mr. Lucky's trial.

ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, the defendant argues that the trial court erred in allowing the admission of the testimony of Julius Lucky, given by Mr. Lucky during his own trial, in such circumstances where Mr. Lucky invoked the Fifth Amendment in the instant case and the defendant was not afforded the right to cross-examine Mr. Lucky in the prior trial.
A review of the record indicates that the testimony of Mr. Lucky was introduced by the State in rebuttal. In fact, the state attempted to introduce this evidence in their case in chief, but this was denied by the trial judge. The state argued that if called, Mr. Lucky would take the Fifth Amendment, thereby making him "unavailable" and allowing the transcript to be admissible as an exception to hearsay under LSA-C.E. Art. 804 B(1), which allows testimony that would otherwise be inadmissable to be admitted if that testimony was given by a witness in a different proceeding, if a party with a similar interest had an opportunity and motive to develop the testimony by direct, cross, or redirect examination. In response, the defendant argued that admission of Mr. Lucky's prior testimony would violate the defendant's right of confrontation. After the denial, the state filed an emergency writ application with this Court. The writ was denied stating: "As to the State's motion to admit the sworn statement of Julius Lucky, the trial court's ruling is affirmed, unless the State can convince the trial court at trial that the sworn statement of Julius Lucky is admissible for a purpose permitted by the Louisiana Code of Evidence."
When the state called Mr. Lucky as a witness in its case in chief, Mr. Lucky invoked his Fifth Amendment right against self-incrimination, and was excused from testifying. On the state's motion, and without objection from the defense, the trial court ruled that Mr. Lucky was an "unavailable" witness under the Louisiana Code of Evidence.
In their case the defense introduced two recorded statements Mr. Lucky gave to police after his arrest. In the first statement, Mr. Lucky denied having any knowledge or involvement with the shootings. In his second statement, Mr. Lucky admitted to shooting both victims. After the defense rested, the state offered the transcript of Mr. Lucky's prior trial testimony in which Mr. *806 Lucky states that Vashon Kelly shot the victims and that Mr. Lucky only admitted to the crime because Kelly threatened him. The defense strenuously objected to the admission of this testimony again arguing that this testimony had not been subject to cross-examination by the defendant. The state responded by pointing out that it was admissible under Article 806 of the Louisiana Code of Evidence, which provides in part:
When a hearsay statement, or a statement defined in Article 801(D)(2)(c) or (D)(3), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked, may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness.
The trial court allowed the transcript to be admitted, and admonished the jury that Mr. Lucky's prior testimony was being offered for the limited purpose of rebutting Mr. Lucky's two statements to police.
Under Article 806, a hearsay declarant is treated as witnesses who may be impeached, although they do not testify at trial. Article 806 tracks Rule 806 of the Federal Rules of Evidence. Whereas Article 806 has generated very little jurisprudence in Louisiana courts since its enactment in 1989, there are numerous federal court cases which lend interpretation to Rule 806.
In United States v. Graham, 858 F.2d 986, 990 (5th Cir.1988), cert. denied, Graham v. United States, 489 U.S. 1020, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1989), the United States Fifth Circuit explained the legislative intent behind the rule:
The purpose of rule 806 is to establish a standard for attacking the credibility of a hearsay declarant: "The credibility of the declarant may be attacked ... by any evidence which would be admissible for those purposes if declarant had testified as a witness." Fed.R.Evid. 806 (emphases added). The Advisory Committee Notes accompanying the rule explain the underlying rationale for the rule by noting that "[t]he declarant of a hearsay statement which is admitted in evidence is in effect a witness. His credibility should in fairness be subject to impeachment and support as though he had in fact testified." Fed. R.Evid. 806 advisory committee note.
In State v. Joseph, 573 So.2d 1248 (La.App. 4th Cir.), writ denied 577 So.2d 31 (La.1991), Joseph and his co-defendant, Hamilton, were charged with first degree murder of a Catholic priest. The defendants' cases were severed, and Hamilton subsequently suffered a stroke and was found incompetent to stand trial. At his own trial, Joseph testified that he had wanted to help the victim, but that Hamilton had threatened to kill him if he did not participate in the murder.
Joseph introduced the testimony of Dr. Aris Cox, who had interviewed Hamilton in 1988 to determine if he was competent to stand trial. According to Cox, Hamilton reported that he had "started feeling funny in the head," and that he "lost it." When Hamilton came to his senses, the victim was in bad shape. On rebuttal, the state put on a police officer, who testified to a hearsay statement Hamilton had given F.B.I., agents in 1987. In this statement, Hamilton alleged that Joseph fully participated in killing the victim. This statement conflicted with the statement Hamilton made to Dr. Cox. The defense objected to the admission of the 1987 statement as hearsay. The trial court allowed the statement to be admitted, and the defendant applied for supervisory writs. The Fourth Circuit denied writs, finding "no error in the trial court ruling in light of C.Cr.P. [sic, C.E.] Art. 806 of 1989." Id. at 1252. Joseph was ultimately convicted, and raised the issue again on appeal.
The Fourth Circuit affirmed defendant's conviction, stating in part:
Here, the defense had previously introduced Hamilton's statement which he gave to Dr. Cox in May 1988. Thus, the testimony as to Hamilton's conflicting December 1987 statement was admissible under Article 806 to impeach the declarant's previous statement. A review of the record reveals no new evidence to show that this Court's earlier decision was patently erroneous and produced an unjust result.
In this assignment of error, the defendant argues that the transcript of Julius Lucky's testimony was admitted under the *807 "unavailable witness" exception of LSA-C.E. 804 Article (B)(1). This article allows hearsay to be admitted if the witness is declared unavailable. The record indicates that when the state attempted to introduce Mr. Lucky's testimony in their case in chief, the trial court denied the admission of the testimony under this article. The testimony of Mr. Lucky was introduced in the state's rebuttal after the defense had introduced two statements given by Mr. Lucky to the police, thereby opening the door to his credibility. Thereafter, the court allowed the transcript to be admitted under Article 806 to attack the credibility of Mr. Lucky. The testimony was offered for the limited purpose of impeachment, not for the truth of the matter asserted. The trial judge clearly pointed this out to the jury. When testimony is admitted as impeachment to attack the credibility of a declarant, the right to cross-examination does not come into play; therefore, the defendant's right to confrontation could not have been violated.

ASSIGNMENT OF ERROR NO. 3
In his third assignment of error, the defendant complains that the jury erred in the procedure used to return a verdict and that the trial court erred in the manner in which it allowed the verdict to be returned. The defendant argues that the jury's verdict forms are defective, and are, therefore, invalid. In the instant case, there were two separate jury forms, properly listing the responsive verdicts for each count. The jury foreperson filled in the defendant's name and the date by hand on the back sides of the two verdict forms. The foreperson also signed each form. The foreperson did not, however, write in the verdicts by hand; rather, he circled the verdict from the printed list of responsive verdicts.
The requirements for a verdict form are contained in LSA-C.Cr.P. Arts. 809 and 810. Article 809 provides:
After charging the jury, the judge shall give the jury a written list of verdicts responsive to each offense charged, with each separately stated. The list shall be taken into the jury room for use by the jury during its deliberation.
Article 810 provides:
When a verdict has been agreed upon, the foreman shall write the verdict on the back of the list of responsive verdicts given to the jury and shall sign it. There shall be no formal requirement as to the language of the verdict except that it shall clearly convey the intention of the jury.
The foreman of the jury shall deliver the verdict to the judge in open court.
In State v. Gilmore, 522 So.2d 658 (La. App. 5th Cir.1988), this Court held that "[u]nder LSA-C.Cr.P. Art. 810, there is no formal requirement as to the language of the verdict except that it clearly convey the jury's intention." In Gilmore, the jury's verdict form read "12-0 guilty"; it did not specify whether the jury found the defendant guilty as charged, or guilty of a lesser included offense. The record showed that the trial court had polled the jury and that each juror had stated for the record that he or she had found the defendant guilty of armed robbery on both counts. This Court held that the jury's oral verdict was sufficient to overcome the ambiguities in the written verdict.
In the case at bar, the trial judge conducted an in-court polling of the jurors, asking them to show by a raise of hands how they had voted. The vote on each count was ten for guilty as charged, and two for not guilty. Defense counsel stated that she was satisfied with the polling. The court's minute entry also reflects a verdict of guilty as charged on both counts. Hence, we find that the jury reached a legal verdict of guilty as charged on both counts.

ASSIGNMENT OF ERROR NO. 4
In his last assignment of error the defendant argues that the trial court erred in the denial of the defendant's Motion for Continuance of the trial in this matter. Defendant filed his Motion for Continuance on April 11, 1996. This motion was heard and denied on April 15, 1996. Writs on the denial were denied both by this Court and the Louisiana Supreme Court.
The granting of a continuance is discretionary on the part of the trial court, and *808 the denial of a Motion for Continuance is not grounds for reversal absent abuse of discretion and a showing of specific prejudice. LSA-C.Cr.P. art. 712; State v. Wilson, 96-251 (La.App. 5th Cir. 10/1/96), 683 So.2d 775; State v. Scott, 612 So.2d 293 (La.App. 5th Cir.1992).
One of the reasons that the defendant argued for a continuance was that a defense witness, Charlene Fisher, would be out of the state during the week of the trial. LSA-C.Cr.P. Art. 709 provides:
A motion for a continuance based upon the absence of a witness must state:
(1) Facts to which the absent witness is expected to testify, showing the materiality of the testimony and the necessity for the presence of the witness at the trial;
(2) Facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred; and
(3) Facts showing due diligence used in an effort to procure attendance of the witness.
In her argument the defense counsel stated that Ms. Fisher would testify as to facts as well as to defendant's character. The defense counsel did not provide the trial court with the facts to which Ms. Fisher was expected to testify, nor was anything offered to show that there was a probability that Ms. Fisher would be available on a future trial date. Moreover, the record is void of any proof that the defense used due diligence to procure Ms. Fisher's appearance at trial.
Defendant's second reason to support his Motion for Continuance was that he had only become aware of the important evidence associated with the state witness Terrance Chestnut. This evidence included sworn testimony given by Chestnut in October, 1995, a written statement by Chestnut, and some documents apparently given to Chestnut by Julius Lucky. Defendant also argued that he had only recently learned of possible "deals" or favors Chestnut received in exchange for his testimony against defendant. The prosecutor responded that the defendant had been aware of Chestnut's sworn testimony for some time, and that the evidence to which defendant referred to had also been available to counsel. The record does not show that defendant's case was compromised by the trial court's denial of a continuance. Defense counsel not only was able to cross-examine Chestnut as to his interest in testifying, she was also able to cross-examine the prosecutor who had spoken to Chestnut about testifying, Kim McElwee.
We find that the trial judge did not abuse his wide discretion in denying defendant's Motion for a Continuance.
A thorough review of the record revealed that there were no errors patent.
For the foregoing reasons, the defendant's conviction is affirmed.
AFFIRMED.
NOTES
[1] Following the hearing to the Motion to Quash prosecutor Kim McElwee voluntarily recused herself from this case. She took the stand and testified that she did not share any information that she obtained in her meetings with the defendant with her fellow prosecutors.