738 So.2d 84 (1999)
STATE of Louisiana
v.
Sandra CORDERO.
No. 99-KA-44.
Court of Appeal of Louisiana, Fifth Circuit.
June 1, 1999.
*85 Laurie A. White, New Orleans, Louisiana, Attorney for Appellant Sandra Cordero.
Paul D. Connick, Jr., District Attorney, Rebecca J. BeckerCounsel of Record, Terry Boudreaux, Walter Amstutz, James F. Scott, III, Assistant District Attorneys, Gretna, Louisiana, Attorneys for Appellee State of Louisiana.
Panel composed of Judges H. CHARLES GAUDIN, JAMES L. CANNELLA and MARION F. EDWARDS.
CANNELLA, Judge.
Defendant, Sandra Cordero, appeals from her conviction of second degree murder, a violation of La.R.S. 14:30.1. We affirm the conviction and remand.
Defendant was indicted by the Jefferson Parish Grand Jury on July 17, 1997 for the second degree murder of her husband, the victim, Dagoberto Cordero. Defendant was arraigned on July 24, 1997 and pled not guilty. On July 29, 1997, defendant filed a motion for discovery and bill of particulars. On September 10, 1997, the State filed answers to the bill of particulars and the trial judge reviewed the answers in open court. The State provided additional answers on September 24, 1997.
On January 27, 1998, the State filed a Notice of Intent to Use Evidence of Other Crimes. A Prieur[1] hearing was held on March 4 and 17, 1998. At the conclusion of the hearing, the trial judge found the proposed "other crimes" evidence admissible.
On March 16, 1998, defendant filed an Application for Appointment of a Sanity Commission based on her mental condition at the time of the offense, which the trial judge granted. At the scheduled sanity hearing on April 15, 1998, defense counsel stated that he had received an oral report from Dr. Candace Cutrone that the defendant "does not fit under any of the applicable standards; therefore we will withdraw the plea of not guilty by reason of insanity..."
On April 27, 1998, the day trial was scheduled to begin, the State filed notices of its intention to introduce three inculpatory statements made by defendant. In response, defendant filed a motion to continue the trial. The trial judge denied the motion. Defendant was then tried by a 12 *86 person jury on April 27, 28, 29 and 30, 1998. On April 30, 1998, the jury returned a unanimous verdict of guilty as charged.
On May 6, 1998, defendant was sentenced to the mandatory term of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. A motion for appeal was filed and granted that day.
The evidence at trial showed that, in the early morning hours of May 17, 1997, defendant made two 911 calls from 3126 Edenborn Avenue, Apartment 518, in Metairie. During the first call, she reported that she had shot her husband, having mistaken him for a man named Jessie who had been threatening her. In the second call 5 minutes later, defendant told the dispatcher that she was still waiting for an ambulance. She again stated that she had shot her husband in the chest, believing him to be an intruder.
Deputy Scott DeJong of the Jefferson Parish Sheriffs Office was among the first officers to arrive at the scene of the shooting. He testified that the front door of the apartment was open, there were no signs of forced entry and the victim was lying on the floor 5 to 10 feet from the doorway. A 12 gauge Winchester pump action shotgun was on the floor near the kitchen. Deputy DeJong spoke to the defendant, who admitted that she shot the victim. The defendant stated that she had mistaken the victim for an intruder. Officers placed defendant in another room. Deputy Michael Kuzma, a defense witness, testified that the victim repeated the words "I'm sorry" several times. Deputy Kuzma further testified that he examined the shotgun and found that it contained "a few rounds."
Detective Terry Graffeo, the case officer, arrived at the scene 20 to 25 minutes after the shooting. By that time the victim had been transported to East Jefferson General Hospital, where he died after receiving emergency treatment. Under Detective Graffeo's supervision, the scene was photographed and evidence was collected. Among the items seized were the shotgun and various articles of clothing. The officers found a box of shotgun shells on a windowsill, along with four individual shells.
During the investigation, Detective Graffeo instructed Detective Michael Tucker to canvass the area for witnesses. Detective Tucker spoke with Patrick Murray (Murray), the owner of Pat's Pub, a nearby lounge. He also spoke with Mark Landry (Landry), a bar employee. Detective Tucker testified that, although he did not speak directly with anyone who witnessed a physical altercation between defendant and the victim, Murray told that him that a bar patron claimed to have seen the couple engage in a fistfight in the parking lot.
At trial, Murray testified that the victim, a regular customer, and the defendant were in the bar in the early morning of the day of the murder, when they became involved in a verbal altercation, Murray asked them to leave. As she left, defendant "shot the bird" at the victim, who stayed at the lounge. Landry's testimony was similar. After the defendant and the victim argued, the defendant left after directing the digital gesture. According to Landry, defendant was in and out of the bar several times that morning.
Detective Tucker returned to the scene after speaking to the witnesses. He transported the defendant to the Criminal Investigations Bureau. Detective Graffeo went to the hospital where he learned that the victim had died. He and a crime scene officer collected the victim's clothing, along with a piece of wadding removed from his body. Detective Graffeo then went to the Criminal Investigations Bureau where he and Detective Tucker advised the defendant of her Miranda rights.[2] She waived her rights and agreed to be interviewed. Detectives Graffeo and Tucker subsequently *87 took two tape recorded statements from defendant.
The first statement was initiated at 7:55 a.m. on May 17, 1997. In it, defendant stated that she and her husband recently had trouble with a man named Jessie[3], and that this man had physically attacked the victim days earlier. As a result of the fight with Jessie, the victim purchased the shotgun.
The defendant stated that she and her husband spent the hours leading up to the shooting at Pat's Bar consuming alcohol. The two argued and the defendant left the victim to go to a nearby bar called The Last Stop. From there she went by herself to the apartment. Defendant said that she heard a noise at the apartment door and she, thinking it was Jessie, picked up the shotgun. She knew that her husband had loaded the weapon. When the door opened, she pulled the trigger twice. The first time she heard a click. The second time the shotgun fired. Defendant stated that when she fired the shotgun, she was seated at the kitchen table. The shotgun was partially in her lap and partly against the table. She did not know that the person entering the apartment was her husband until after she fired the shot. The defendant said that she and her husband did not struggle over the shotgun. She denied that she and her husband had engaged in a physical confrontation at Pat's Bar.
Detective Tucker testified that, after the first statement was completed, defendant told him and Detective Graffeo that she lifted the shotgun to her shoulder before firing. Then she stated that when her husband entered the apartment, the two argued, then struggled over the shotgun. As a result, the shotgun fired accidentally. Suspicious of the changes in defendant's story, the officers decided to conduct a second recorded interview.
The second statement started at 12:16 p.m. on May 17, 1997. In this statement, the defendant said that she did not go directly home upon leaving The Last Stop, but returned to Pat's Bar twice. She claimed that she did not now remember whether or not she had put the shotgun to her shoulder before it fired. Defendant did repeat that she and the victim struggled over the shotgun and that it fired accidentally. Defendant denied that she intended to shoot her husband. When asked to describe Jessie, she stated that he stands about 5 feet, 7 inches tall, with long reddish hair. The victim was 5 feet, 4 to 5 inches tall, and was dark complected. After the statements were completed, Detective Graffeo arrested the defendant on the charge of second degree murder.
Dr. Susan Garcia, a forensic pathologist, performed an autopsy on the victim's body. She testified that she determined the cause of death to be a gunshot wound to the chest, which resulted in penetrating injuries to the liver. The victim died from loss of blood. The doctor recovered shotgun pellets from inside the wound. She opined that, based on the course and track of the wound, the weapon was fired from in front of the victim and that the bullet traveled downward and towards the victim's back. She further stated that if the victim was bent slightly forward, the shot would have been fired straight on to create such a track. If the victim was bent over a bit more, the gun would have been pointing upwards to form that track. Toxicology tests showed that the victim had a blood alcohol level of .15.
The State produced evidence of two Prieur incidents at trial. Officer Henry Jaume of the Kenner Police Department testified that, on August 4, 1995, he arrested both defendant and the victim at their California Street home on charges of disturbing the peace involving domestic violence. They were both intoxicated. Officer *88 Jaume indicated that there were other occasions on which he handled domestic disturbances involving the couple.
Deputy Edward Duclos of the Jefferson Parish Sheriff's Office testified that, on September 21, 1996, he investigated an incident at the Edenborn Avenue apartment, in which defendant was alleged to have stabbed the victim in the shoulder with a pair of scissors. Deputy Duclos inspected the stab wounds and had the victim sign a written statement describing the incident. Defendant had fled the premises and Deputy Duclos was unable to locate her. A warrant was issued for defendant's arrest on a charge of aggravated battery. The warrant was outstanding on May 17, 1997.
Defendant testified at trial, stating that she and her husband met in January of 1993 and married in June of 1995. Prior to marrying, the two lived together. Five to 6 months into the relationship, the victim began drinking excessively and abusing the defendant. In October of 1996, after hearing their disturbing the peace charges, a Kenner City Court ordered that the couple live separately. Defendant began living with her mother on Neyrey Street. She admitted to stabbing her husband in September of 1996 after he hit her during an argument.
In April of 1997, defendant moved into the Edenborn Avenue apartment with her husband, at his request. At that time two men, Tony and Jessie, were living there with the victim. When asked to move out, Jessie refused. As a result, there were several confrontations between Jessie and the victim. Jessie appeared at the apartment once while the defendant was there alone and tried to force his way inside. Defendant claimed that the victim feared Jessie might try to break in again, so on May 8, 1997, defendant and the victim went to Wal-Mart, where he bought a shotgun. The victim did not show the defendant how to use the shotgun, but told her that she should not hesitate to pick it up and fire if someone tried to get into the apartment. Six days later, on May 14, 1997, the victim and Jessie were involved in a physical confrontation at The Last Stop Lounge. The victim was rendered unconscious and had a cut over his eye.
Two days after purchasing the shotgun, on the night of May 16, 1997, the couple started drinking beer at the Edenborn Avenue apartment. At midnight they went to Pat's Pub together, where they continued to consume alcohol and defendant played video poker. After an hour and a half, defendant wanted to return home, but the victim refused to leave. Defendant left anyway and went to The Last Stop to visit a barmaid friend, leaving the victim at Pat's Pub. After having a drink there, she returned to Pat's Pub, and found the victim extremely intoxicated. He still did not want to leave. The couple engaged in what defendant believed others might call a verbal altercation, but to defendant, it was a "normal" exchange. She went outside the lounge to smoke a cigarette. After that, she went inside and again asked the victim to leave with her. The victim became angry and the two had a heated argument. Defendant made an obscene gesture at the victim and left the bar.
Defendant testified that she went directly to the apartment, which is across the street from the bar. She used the bathroom, then sat at the kitchen table and smoked a cigarette. After about 30 minutes, she heard a noise outside the door. She got up to grab the shotgun, which was in a corner near the door. She then resumed her seat in the kitchen, holding the shotgun across the table. There was little light in the apartment. When the door opened defendant saw a shadow. She pulled the trigger, but the shotgun did not fire. Then, defendant said that she realized that the safety was on, so she disengaged it. She also realized that the person at the door was her husband when he asked what she was doing. Defendant claimed that the victim threatened to beat her to death with the shotgun and reached *89 for the weapon. When defendant pulled the shotgun away, it fired.
Defendant stated that she had been afraid of the victim for years and that she believed he would beat her with the shotgun. She further testified that she lied in her statements to police because she feared that they would not believe her if she told the truth.
On appeal, defendant contends that the evidence was insufficient to support the verdict, that the trial judge abused its discretion in denying her request for a continuance on the day of trial and that the trial judge's denial of her Motion to Suppress certain statements, in which she allegedly told police that she put the weapon to her shoulder, was improper under La.C.Cr.P. Art. 716 and the related jurisprudence and violated her federal and state constitutional rights.
Defendant first argues that the State failed to prove that she had the specific intent necessary to support a second degree murder conviction. Thus, the evidence was insufficient to convict her of second degree murder.
The standard for appellate review of the sufficiency of evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); State v. Abercrombie, 375 So.2d 1170, 1177-1178 (La.1979), cert. denied, Abercrombie v. Louisiana, 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980). See also: State v. Mussall, 523 So.2d 1305 (La.1988). Under Jackson, a review of a criminal conviction record for sufficiency of evidence does not require a court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Id. A reviewing court is required to consider the whole record and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt. It does not "serve as a vehicle for a reviewing court to second guess the rational credibility determinations of the factfinder at trial." State v. Juluke, 98-0341 (La.1/8/99), 1999 WL 21252, 725 So.2d 1291. The Court in Juluke stated:
In a case involving circumstantial evidence in which the jury has reasonably rejected the defense offered at trial, the reviewing court therefore "does not determine whether another possible hypothesis has been suggested by defendant which could explain the events in an exculpatory fashion.".... Instead, the reviewing court must "evaluate[ ] the evidence in the light most favorable to the prosecution and determine[ ] whether the alternative hypothesis is sufficiently reasonable that a rational juror could not `have found proof of guilt beyond a reasonable doubt.'".... (Citations omitted)
Second degree murder is the killing of a human being when the offender has specific intent to kill or inflict great bodily harm. La.R.S. 14:30.1 A(1). Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). The determination of specific criminal intent is a question of fact. State v. Seals, 95-305 (La.11/25/96), 684 So.2d 368, 373, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Lewis, 97-160 (La.App. 5th Cir. 7/29/97), 698 So.2d 456, 459.
Specific intent may be inferred from the circumstances and the actions of defendant. State v. Seals, 684 So.2d at 373; State v. Lewis, 698 So.2d at 459. In addition, specific intent to commit second degree murder may be inferred from the pointing of a gun at close range and pulling the trigger. State v. Seals, 684 So.2d at 373; State v. Thorne, 93-859 (La.App. 5th Cir. 2/23/94), 633 So.2d 773, 777.
*90 Defendant acknowledged from the beginning that she shot the victim. However, she provided several different versions of how the shooting occurred. First, she told the 911 dispatcher and sheriff's deputies that she mistook the victim for an intruder and that she fired the shotgun as it lay across the kitchen table. She then told Detectives Graffeo and Tucker that she put the shotgun to her shoulder, which implied that she took aim before firing. Defendant then changed her story during her second recorded interview with the detectives when she stated that the victim was shot when they struggled over the weapon. Finally, at trial, defendant testified that the victim threatened to take the gun from her and beat her with it, and that the shotgun discharged as she attempted to pull it from his reach. In her testimony, she stated that the victim never touched the weapon.
Defendant's actions contradict her assertion at trial that the shooting was accidental and that she acted out of fear of the victim. First, Detective. Graffeo testified that during the investigation, the defendant neither claimed to have been battered by the victim, nor expressed any fear of him. Detective Tucker also testified that the defendant did not complain that the victim was violent with her in the hours preceding the murder or that she was afraid of him. The evidence further showed that the defendant argued with the victim, who was highly intoxicated, in Pat's Pub. She left and returned twice and the couple continued to argue. Finally, after directing an obscene gesture at the victim, she went to his apartment, where she knew there was a loaded shotgun, and waited. The evidence further shows that the defendant used another weapon against the victim less than a year before the murder. She admitted to having stabbed the victim in September of 1996.
Although the defendant claimed that she was living with the victim at the Edenborn Avenue apartment, there is no independent evidence of that. The couple had been ordered by a Kenner City Court to live separately and the defendant testified that she kept her personal belongings at her mother's residence. Detective Graffeo testified that, in examining the apartment, he did not see any female clothing or toiletries. The victim's landlady, Bridget Rodriguez, testified that she saw the defendant at the apartment on occasion, but that she was not a lessee. Thus, defendant did not have to go to the Edenborn Avenue apartment after arguing with the victim at Pat's Bar. She could have avoided another confrontation by returning to her mother's house.
According to the defendant, she pulled the shotgun's trigger twice. The first time, she heard a click or a noise. The second time, the shotgun fired. Louise Walzer (Walzer), a firearms expert, testified that pulling the trigger of a pump shotgun will result in a clicking sound if there is no round in the chamber. For a shot to fire on the second attempt, one must intentionally pump the gun. This was supported by the testimony of Detective Graffeo. In order for a pump shotgun to emit a "click" when the trigger is pulled, the shotgun must have been pumped. Thus, the evidence shows that the defendant must have intentionally pumped the shotgun for it to have fired. Furthermore, the evidence shows that the defendant shot the victim at close range. Defendant testified that she was approximately 7 feet away from the victim when the shotgun discharged. This was supported by the testimony of Walzer who examined the markings on the victim's shirt and the pellets removed from his body. Walzer test-fired the shotgun at various distances from a target and compared the markings to the pattern of pellet holes in the victim's shirt. Walzer determined that the muzzle of the shotgun was 8 to 10 feet away from the victim's shirt when the shot was fired. Although Walzer's tests did not take into account the angle from which the shot was fired, she judged the path to have been "pretty much straight on." (R., p. 391).
*91 After viewing the evidence in the light most favorable to the prosecution, we find that the State proved that the defendant had specific intent to kill or inflict great bodily harm beyond a reasonable doubt.
In defendant's second assignment of error, she asserts that she was prejudiced by the trial court's refusal to grant a continuance on the day of trial when the State complied with a discovery request at the last minute. Defense counsel made an oral motion for a continuance because the prosecutor had responded to a discovery request by supplying him with copies of several police reports on Thursday, April 23, 1998, only 4 days before trial. Defense counsel asserted that one of the reports contained pertinent information about the subject known as "Jessie," including his last name and his last known address. Defense counsel stated that he did not look at the materials until 2 days after he received them. However, he had been trying to find Jessie for some time prior to receiving the reports because he believed Jessie's testimony would support the defendant's case. The materials provided by the State contained Jessie's last name and last known address, giving counsel more direction in his search. When defense counsel went to the listed address, counsel was told by a neighbor that Jessie had lived there until his arrest several months earlier. Defense counsel stated that he then tried to locate Jessie through law enforcement computer records, but was unsuccessful. Defense counsel asserted that, without a continuance, he would be unable to locate this man in time to call him as a trial witness. The prosecutor argued that he had turned over the requested materials as soon as they were made available to him and that his response to discovery was timely.
The trial court ruled:
... the bottom line is that the State has used its considerable sources to attempt to find this man and has been unable to. There is no indication from the record that a further delay in the trial, which has already been delayed a very long time-it's one of the oldest cases on the docket-will help anybody find this person who they can't find.
Because of that, I'm going to deny the Motion to continue. And while I would normally require the D.A. to do something further, there is really nothing further to be done.
(R., p. 240).
La.C.Cr.P. art. 707 requires a motion for continuance to be in writing and filed at least 7 days prior to trial, although in the interest of justice, the trial court may grant a continuance upon written motion at any time after a contradictory hearing. State v. Winfrey, 97-427 (La.App. 5th Cir. 10/28/97), 703 So.2d 63, 68, writ denied, 98-0264 (La.6/19/98), 719 So.2d 481. A written motion is not required when circumstances prompting the motion occur unexpectedly and there is no opportunity to prepare it. State v. Winfrey, 703 So.2d at 68; State v. Malinda, 95-292 (La.App. 5th Cir. 10/31/95), 663 So.2d 882, 886. An oral motion was justified here because the basis for the motion became apparent less than a week prior to trial.
The granting of a continuance is discretionary on the part of the trial judge. La.C.Cr.P. art. 712; State v. Kelly, 96-903 (La.App. 5th Cir. 11/12/97), 704 So.2d 800, 807-808, writ denied, 97-3104 (La.4/9/98), 717 So.2d 1142; State v. Wilson, 96-251 (La.App. 5th Cir. 10/1/96), 683 So.2d 775, 776. The denial of a motion for continuance is not grounds for reversal absent abuse of discretion and a showing of specific prejudice. State v. Kelly, at 704 So.2d at 807-808; State v. Wilson, 683 So.2d at 776.
The trial judge stated in her reasons that the prosecution did all that it could to fully respond to defendant's discovery requests and there was no evidence that further delay in the proceedings would lead to success in locating the missing witness. In addition, at trial, defendant called Deputy Donald Gossnickle, who *92 stated that he investigated and reported the altercation between the victim and Jessie Pavalore. The officer stated that it was clear to him that the two men had been involved in a fight and that the victim, who had a minor laceration over his eye, was highly intoxicated at the time. This testimony supported defendant's contention that the victim was involved in a conflict with Jessie and that there was reason to fear another confrontation with Jessie. Based on these facts, we find that defendant was not prejudiced by the denial of a continuance and the trial judge did not abuse her discretion in denying defendant's motion.
In her third assignment of error, defendant asserts that the trial judge erred in denying the Motion to Suppress a statement that she made to the detectives in the time between the two recorded statements. In that statement, defendant allegedly told the detectives that, before shooting, she put the weapon to her shoulder. Defendant argues that the trial judge erred in allowing the State to introduce any testimony regarding this inculpatory statement because the State did not provide her with notice of the statement until the day of trial. She claims that the trial judge's failure to suppress the statement violates La.C.Cr.Pr. Art. 716, related jurisprudence and her rights under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 2 of the Louisiana Constitution.
On the morning of trial, the State provided defendant with a Notice of Intention to Use and Introduce Statement of Defendant in Evidence under La.C.Cr.P. art. 768, citing defendant's comment to the detectives made in the time between the two recorded statements that she had put the shotgun to her shoulder before firing. After defendant moved for suppression of the statement because she did not receive notice of its existence despite discovery requests, a hearing was immediately held. Detectives Tucker and Graffeo testified on the question of whether the statement at issue was made after a knowing and voluntary waiver of rights. The trial judge ruled that the statement was admissible.
Defendant argues that, because the State waited until the day of trial to file the written notice, she was unprepared to respond to the statement. Defendant further contends that she was prejudiced by admission of the statement because it was the State's strongest evidence of specific intent.
La.C.Cr.P. art. 716 B requires the State to inform defendant of the existence, but not the contents, of any oral statement that it intends to offer against defendant at trial. Paragraph C of the article requires the state to disclose the substance of any oral statement made by defendant in response to police interrogation. La. C.Cr.P. art. 768 provides:
Unless the defendant has been granted pretrial discovery, if the state intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing prior to beginning the state's opening statement. If it fails to do so a confession or inculpatory statement shall not be admissible in evidence.
The record shows that the State responded to defendant's discovery requests by providing her with the two recorded statements of May 17, 1997. During the second interview, Detective Graffeo questioned defendant about her statement made during the interval between the first and second taped interviews that she had lifted the shotgun to her shoulder. When defendant received the second recorded interview through pre-trial discovery, she was put on notice of the statement's existence, its contents and the people to whom it was directed. It is further noted that after defendant received the recorded statements, defense counsel found them constitutionally sound and withdrew his original motion to suppress the confession. Since defendant was put on notice of the *93 oral comment made between the two recorded statements through pre-trial discovery, it was not necessary for the State to provide further written notice on the day of trial. The additional notice on the day of trial served to further inform the defendant of the State's intention to introduce the oral statement as evidence. Thus, we find that the State sufficiently complied with the requirements of discovery.
La.C.Cr.P. art. 920 provides: "the following matters and no others shall be considered on appeal: (1) An error designated in the assignments of error; and (2) An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence."
For the purpose of an error patent review the "record" in a criminal case includes the caption, the time and place of holding court, the indictment or information and the endorsement thereon, the arraignment, the plea of the accused, the bill of particulars filed in connection with a short form indictment or information, the mentioning of the impaneling of the jury, the minute entry reflecting sequestration in a capital case, the verdict, and the judgment or sentence. State v. Oliveaux, 312 So.2d 337, 339 (La.1975); State v. Boudreaux, 95-153 (La.App. 5th Cir. 9/20/95); 662 So.2d 22, 28.
We note one patent error. The record reflects that defendant was not advised of the 3 year time limit for filing an application for post conviction relief, as required by La.C.Cr.P. art. 930.8. This article dictates that, except under certain limited circumstances, a defendant must file his application for post-conviction relief within 3 years after his judgment of conviction. Section C provides that the trial judge shall inform defendant of this prescriptive period at the time of sentencing. However, the failure to inform the defendant is not a ground for vacating the sentence. Rather, the remedy is to remand the case with an instruction to the trial judge to inform the defendant of the provisions of Article 930.8 by sending written notice to defendant within 10 days after the rendition of this opinion and to file written proof in the record that defendant received such notice. State v. Birden, 95-1007 (La.App. 5th Cir. 5/15/96), 675 So.2d 1187, 1190-1191; State v. Crossley, 94-965 (La.App. 5th Cir. 3/15/95), 653 So.2d 631, 636-637, writ denied, 95-0959 (La.9/15/95), 660 So.2d 459.
Accordingly, the defendant's conviction is hereby affirmed. The case is remanded with an instruction to the trial judge to inform the defendant of the provisions of C.Cr.P. article 930.8 by sending written notice to the defendant within 10 days after the rendition of this opinion and to file written proof in the record that the defendant received such notice.
AFFIRMED AND REMANDED.
NOTES
[1] State v. Prieur, 277 So.2d 126 (La.1973).
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.
[3] The name is spelled "Jesse" in the transcript of defendant's statement, but is spelled "Jessie" in the trial transcript.