961 So.2d 516 (2007)
STATE of Louisiana
v.
Abron J. MICKEL.
No. 07-KA-47.
Court of Appeal of Louisiana, Fifth Circuit.
May 29, 2007.
*519 Paul D. Connick, Jr. District Attorney, Terry M. Boudreaux, Thomas J. Butler, Assistant District Attorneys, Gretna, LA, for Plaintiff/Appellee.
Bertha M. Hillman, Louisiana Appellate Project, Thibodaux, LA, for Defendant/Appellant.
Panel composed of Judges CLARENCE E. McMANUS, FREDERICKA HOMBERG WICKER, and GREG G. GUIDRY.
FREDERICKA HOMBERG WICKER, Judge.
In this criminal matter defendant, Abron J. Mickel, appeals his conviction on a charge of armed robbery in violation of La. R.S. 14:64, and his conviction and sentence as a multiple offender. For the reasons that follow, we affirm.
The defendant was originally charged by bill of information with armed robbery.[1] After he entered a plea of not guilty, he was tried by a jury and found to be guilty as charged. The trial court denied defense motions for judgment of acquittal and for a new trial, and in due course defendant was sentenced to serve sixty years at hard labor.
Subsequently, the State filed a multiple offender bill of information, alleging that the defendant entered guilty pleas to charges of distribution of cocaine in 1993 and 1995, and was convicted in 1998 for being a convicted felon in possession of a firearm. The defendant denied the allegations in the multiple offender bill and filed a motion to quash that was denied by the trial court. Subsequently, the defendant made an oral motion to quash the multiple offender bill of information as it related to the conviction of being a convicted felon in possession of a firearm in violation of La. R.S. 14:95.1. In response to that motion, the State agreed to dismiss that part of the multiple offender bill of information, and amended it accordingly. After a hearing on the multiple offender bill of information, the trial court adjudicated the defendant to be a third felony offender.[2] The trial court vacated the original sentence and re-sentenced the defendant to serve life imprisonment without the benefit of parole, probation or suspension of sentence. The defendant filed a timely motion for appeal which was granted.
FACTS
The victim, Charles Williams, testified at trial. He stated that in July of 2003, he was employed as a certified nursing assistant at Jo Ellen Smith Convalescent Center. On July 4th, after he received his paycheck, Mr. Williams and a co-worker, Danita Coleman, went together to a nearby store to cash their checks. Mr. Williams put his cash in a wallet in his car. Mr. Williams wanted to get a haircut, but because it was the Fourth of July, the barbershop was closed. Instead Mr. Williams went to Ms. Coleman's house where her boyfriend, Torian Maryland[3], *520 agreed to cut Mr. Williams' hair. After the haircut, Mr. Williams remained at Ms. Coleman's apartment, passing the time by watching T.V. and playing cards.
Later that evening, Mr. Williams went with Mr. Maryland to meet his cousin, a meeting that had been arranged by Ms. Coleman a few weeks earlier. When the two men got into the car, Mr. Williams took his wallet from the back seat and paid Mr. Maryland ten dollars for the haircut. Mr. Williams drove to another apartment complex. When they arrived at the apartment building, Mr. Maryland borrowed Mr. Williams' cell phone to call his cousin. Mr. Williams waited in his car. A man came out of the complex and was introduced to Mr. Williams as "Bop." Bop was about six feet tall, had tattoos on his left arm, and was dressed in a camouflage outfit. Bop got into the car and began a conversation with Mr. Williams. Mr. Williams assumed that Bop was Mr. Maryland's cousin with whom Ms. Coleman had set up the meeting. About five minutes later, Mr. Maryland came back to the car, knocked on the window and asked to speak to Bop. Bop got out of the car and had a conversation with Mr. Maryland out of Mr. Williams' earshot. Bop got back into the car. Mr. Maryland and another man came up to the car and Bop told the man to get in. The man got in the back seat and pointed a gun at Mr. Williams and asked, "What you got?" Mr. Williams replied that he had nothing. Bop went through Mr. Williams' pockets, but found nothing. Mr. Williams gave the man with the gun two rings and a watch, but no money. The gunman continued to ask for money, which Mr. Williams denied having. However, the gunman found Mr. Williams' wallet under the seat and took $485.00. The gunman instructed Mr. Williams not to look at him, and he and Bop got out of the car and ran away together. Mr. Williams drove to a nearby gas station where he spotted a police car. He reported the robbery to police at that time.
Mr. Williams admitted that he was reluctant to tell police officers that he was gay, so he simply told them he was at the apartment complex to meet a friend. Mr. Williams stated that the report to officers was accurate in every other detail. Subsequently, Mr. Williams identified Mr. Maryland and the defendant from photo lineups. Further, Mr. Williams identified the defendant at trial as being the gunman.
Torrian Maryland, who at the time of trial was serving a two-year sentence in St. Charles Parish for theft, testified as a hostile witness to the State. He testified that in July of 2003 he was dating Danita Coleman who worked with Charles Williams. On the Fourth of July, he was with Mr. Williams at Ms. Coleman's apartment. Mr. Maryland testified that he and Mr. Williams got into Mr. Williams car and drove to an apartment building on Manhattan Street on the West Bank. However, Mr. Maryland denied that he was to introduce Mr. Williams to anyone. Mr. Maryland's version was that he needed a ride to his mother's home. On the way the two men stopped at a nearby apartment building on Manhattan because Mr. Maryland wanted to buy a "bag of weed." Mr. Maryland got out of the car. He stated that there were several individuals around the car including a man named "Black" who wanted to sell Mr. Williams drugs. Mr. Maryland also testified that Black has been known to commit robberies in that area. Black got in the car and Mr. Maryland went to a nearby store. When Mr. Maryland returned a short time later, Mr. Williams had driven away.
Mr. Maryland admitted knowing the defendant and knew that his nickname was "Bop," but denied introducing him to Mr. *521 Williams. Mr. Maryland further testified that Black is now deceased.
The court heard testimony from Detective John Carroll of the Jefferson Parish Sheriff's Office who investigated the armed robbery of Mr. Williams. In the course of his investigation Detective Carroll interviewed both Mr. Williams and Mr. Maryland. After the interview with Mr. Maryland, the investigation focused on the defendant as the likely perpetrator. Subsequently, Mr. Williams was shown two photo lineups. In one he identified Mr. Maryland, and in the second he identified the defendant as the man who robbed him at gunpoint. An arrest warrant was obtained for the defendant and he was prosecuted for the crime. Detective Carroll and his investigating team was unable to find any further evidence such as DNA, fingerprints, fibers, hair samples or a gun.
Two other police officers who participated in the investigation also testified at trial. The officers verified that the defendant came up to them to report the robbery, and that interviews with Mr. Maryland and the defendant were conducted. Further, the officers testified concerning the identifications by the photo lineups.
Bernice Mickel, the defendant's sister, testified that on July 4, 2003 she was at a family gathering at 1013 Pailet Street in Harvey. She further testified that the defendant was also at the party and was still there when she left at about 3:30 or 4:00 that afternoon. Ms. Mickel stated that she knew "Black" whose real name is Tyrone Gilmore. She identified a photo of Black at trial, and informed the court that Black is now deceased. Upon further examination, Ms. Mickel admitted that the defendant lived at the apartment complex where the robbery took place and that she was not with him at the time the robbery took place.
Edith Mickel, another sister of the defendant, also testified at trial. At the time of the robbery, she was living with the defendant in an apartment in the West Chase complex on Manhattan Boulevard in Harvey. On the Fourth of July, 2003 she went with the defendant and their mother to a family party at her grandmother's home on Pailet Street in Harvey. They arrived at about 3 pm and stayed until 8:00 or 8:30 that evening. At that time they drove home to get the defendant's clothes because he was leaving on a trip to visit his girlfriend in Texas.
Antonio Payne, who was incarcerated at the time of the trial, testified that on July 4, 2003 he was at the West Chase Apartments "hanging out" and "selling drugs." Mr. Payne also admitted using drugs and testified that he was on heroin, "crack" and "weed" that day.
A man named "Autory" asked Mr. Payne if he wished to meet someone and indicated a man sitting in a car parked in the parking lot. Mr. Payne walked over to the car, got into the passenger's seat and had a conversation with the driver, who was gay, about exchanging sexual activity for money. At that point a man Mr. Payne knew slightly came over to the car and asked Mr. Payne if he still had "anything." Mr. Payne responded that he had some drugs and could "take care" of him. Mr. Payne identified the man as "Pooh" or "Black," but stated that his real name was Terrell Gilmore. Black got into the back seat, grabbed Mr. Payne from behind and put a gun to his head. Mr. Payne gave Black all of the money and drugs he had. Black then robbed the driver and ran out of the car. Mr. Payne returned to his sister's house nearby.
Mr. Payne explained that he did not come forward earlier because he was afraid of retribution by Black. He indicated that he had perpetrated robberies and *522 done drugs with Black before and knew that he was dangerous. Mr. Payne left town for a while, but returned when he learned that Black was dead. Mr. Payne further testified that he knew the defendant from the neighborhood, although they were not really friends.
The victim again took the stand. He testified that he was certain it was the defendant who robbed him and he did not recognize photos of Black.
LAW
In brief to this Court, the defendant assigns two errors for our review. In the first he asserts the trial court erred in denying his challenges for cause relating to potential jurors, Rick Moore,[4] Albert Roux and Eddie Chan.
To preserve a denial of a challenge for cause for review on appeal, a defendant must first show that he objected at the time the trial court refused to sustain the challenge. State v. Lindsey, 06-255 (La.1/17/07), 948 So.2d 105. Further, by law, a defendant has twelve peremptory challenges in a trial for an offense punishable by imprisonment at hard labor. La. Const. art 1, § 17: La.C.Cr.P. Art. 799. It is essential that a defendant show that he has exhausted all of his peremptory challenges and that the trial court erroneously denied a challenge for cause to prove an error warranting reversal of both the conviction and sentence. The defendant has met that requirement.
Prejudice is presumed when a district court erroneously denies a challenge for cause and the defendant ultimately exhausts his peremptory challenges. A district court's erroneous ruling which deprives a defendant of a peremptory challenge substantially violates that defendant's rights and constitutes reversible error. State v. Lindsey, supra 948 So.2d at 107 (citations omitted)
Under La.C.Cr.P. art. 797, a defendant may challenge a juror for cause if:
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(4) The juror will not accept the law as given to him by the court. . . .
As explained by our Supreme Court;
When a juror expresses a predisposition as to the outcome of a trial, a challenge for cause should be granted. Yet, if after subsequent questioning, or rehabilitation, the juror exhibits the ability to disregard previous views and make a decision based on the evidence presented at trial, the challenge is properly denied. Id. When assessing whether a challenge for cause should be granted, the district judge must look at the juror's responses during his or her entire testimony, not just "correct" isolated answers or, for that matter, "incorrect," isolated answers.
(citations omitted)

State v. Lindsey, supra 948 So.2d at 107, 108.
A trial judge is afforded great discretion in determining whether cause has been shown to reject a prospective juror. This court is reviewing the matter on a transcript in a record and does not have the benefit of observing the potential jurors in person to assess the facial expressions and intonations in voice as they answer questions. See; State v. Bozeman, *523 03-897 (La.App. 5 Cir. 1/27/04), 866 So.2d 1029, 1032, writ denied, 04-0497 (La.7/2/04), 877 So.2d 141. Therefore, this court will not disturb such a decision by the trial judge unless a review of the voir dire as a whole indicates an abuse of discretion. State v. Williams, 02-1188 (La. App. 5 Cir. 4/8/03), 846 So.2d 22.
In the matter before us, the defendant argues his challenge for cause of potential juror Rick Moore should have been granted. The defendant asserts that Mr. Moore demonstrated bias in favor of the prosecution, and that his views towards defendant's failure to testify at trial suggested an inability to render judgment according to law. Further, the defendant maintains that Mr. Moore did not afford the defendant a presumption of innocence.
In response to all of the defendant's allegations regarding the trial court's denials of challenges for cause, the State asserts that a review of the entire voir dire reveals that the potential jurors demonstrated their ability and willingness to decide the case impartially according to the law and evidence.
A complete reading of the voir dire of Mr. Moore shows that he was a victim of crime and had several friends who were either prosecutors or police officers. He admitted his bias toward the State. However, when questioned by the trial judge, Mr. Moore stated that he would do his best to give the defendant his day in court and weigh the evidence in a fair and impartial way. Mr. Moore also stated that he understood that the State had the burden to prove the defendant's guilt beyond a reasonable doubt.
A charge of bias may be removed by the rehabilitation of the prospective juror. State v. Chapman, 410 So.2d 689, 695 (La.1981) (citations omitted). A trial judge's refusal to excuse a prospective juror on the ground that he is not impartial is not an abuse of discretion where, on further inquiry or instruction, the juror has demonstrated the willingness and the ability to decide the case impartially according to the law and evidence. State v. Scott, 04-1312 (La.1/19/06), 921 So.2d 904, 921, cert. denied, ___ U.S. ___, 127 S.Ct. 137, 166 L.Ed.2d 100 (2006) (citation omitted).
We find that Mr. Moore, although exhibiting a pro-prosecution bias, demonstrated his willingness and ability to be impartial in reviewing the evidence and deciding the case.
The defendant also asserts that Mr. Moore should have been dismissed for cause because of his bias against the defendant should he chose not to testify at trial. We do not find merit in the defendant's argument. Considering the entire voir dire, it is clear that Mr. Moore understood the law, the burden of the State to prove guilt, and the defendant's right not to testify. Mr. Moore did admit that there could be a "little seed of doubt" that could remain in the "back of his mind" if the defendant did not testify. However, when asked if he would find defendant guilty because he did not testify, Mr. Moore stated affirmatively, "No, no, I certainly wouldn'tjust because the defendant chose not to testify, I would not take that as I've got to find him guilty, no."
We note that in the voir dire, the trial judge explained to all of the potential jurors that the defendant could rely on his presumption of innocence, had a right not to testify and that no inference of any kind could be drawn from the fact that the defendant does not testify. The trial court asked the jury pool if there was anyone who could not conscientiously apply the law or give both the State and the defendant a fair trial. None of the jurors indicated that they could not properly serve.
*524 Accordingly, we find no abuse of the trial court's discretion in denying the challenge for cause as to Mr. Moore.
Albert Roux, also was a subject of a defense challenge for cause, which was denied. In brief to this court, the defendant argues that Mr. Roux repeatedly indicated he could not be fair, showed a bias toward the prosecution, and shifted the burden of proof to the defendant, and would hold a failure to testify against the defendant.
During the exchange between the trial judge and Mr. Roux, it was revealed that Mr. Roux had a friend who was a police officer and a victim of a crime. Mr. Roux stated that because of that, he "would probably have, subconsciously, am biased toward the prosecution. . . ." Mr. Roux also stated that he would listen to the defendant's case and "(i)f they had compelling argument that the gentleman was innocent, compelling, I could be impartial." At this point the trial judge explained the presumption of innocence and the State's burden of proof, and asked Mr. Roux if he understood and specifically if he would require the defendant to prove his innocence. Mr. Roux responded, "I would again, I would do what the law states. I would consciously acknowledge that he's innocent until proven guilty. But again, subconsciously, whether it would be a bias or not, there's a possibility."
The discussion between the trial judge and Mr. Roux continued with the trial judge explaining the law and Mr. Roux making general comments on the criminal justice system. However, in the end Mr. Roux told the trial judge that he can follow the law if he sat on the jury.
The presumption of innocence is the foundation of our criminal justice system and the unwillingness of a prospective juror to apply the presumption of innocence is a serious matter. When a prospective juror clearly asserts that he could not or probably would not apply the presumption of innocence that juror, unless rehabilitated, should be struck for cause. The trial judge's failure to grant such a challenge is reversible error. State v. Gant, 06-232 (La.App. 5 Cir. 9/26/06), 942 So.2d 1099, 1114 (citation omitted).[5] As we explained in Grant;
An important part of a voir dire examination is to discover any prospective juror who may have difficulty understanding the defendant's right to the presumption of innocence, as well as to discover a juror who may hold it against a defendant who exercises his right. A prospective juror's declaration of fairness and neutrality does not assure an understanding of the constitutional principle of the presumption of innocence. When a prospective juror clearly asserts that he could not or probably would not apply the presumption of innocence that juror should be struck for cause unless rehabilitated. The failure of the trial judge to grant such a challenge is reversible error. A prospective juror's responses indicating a lack of understanding of the law, i.e. self-defense, rather than bias is not grounds for cause because a juror is not expected to be familiar with legal terms or to understand jurisprudential distinctions given in an abstract context. A trial judge does not abuse the broad discretion vested in him in denying a challenge for cause of a juror who expressed a need for the defendant to produce some evidence on his own behalf in order to find him not guilty when the juror's response was *525 caused more from a lack of understanding of the law than bias.
(citations omitted)

State v. Gant, 942 So.2d at 1114
We believe Mr. Roux's initial response was caused more from a lack of understanding of the law, than bias. We also find that the continued discussion and explanation of the law by the trial judge and the ultimate acknowledgement that he could apply the law substantiates the trial court's decision to deny the challenge for cause as to Mr. Roux.
The defendant's objection to Eddie Chan concerns his lack of understanding of the defendant's Fifth Amendment right not to testify and his confusion by the entire proceeding. We find, as we did with Mr. Roux, that Mr. Chan's initial responses were due to a lack of understanding of the law. A review of the entire voir dire in this case shows that the trial judge carefully explained the law on every issue related to the presumption of innocence and the burden of the State to prove the defendant guilty beyond a reasonable doubt. At the end of the discussion, Mr. Chan's responses show that the defendant "would not lose points" if he did not testify at trial. He also stated that he did not "believe any innocent person should go to jail."
Given these responses and the careful, deliberate and detailed explanation of the law by the trial court, we cannot find an abuse of discretion in the denial of the challenge for cause as to Mr. Chan.
In the second assignment of error, the defendant asks this Court to vacate his adjudication as a multiple offender, and the enhanced sentence resulting from that adjudication. Defendant asserts the multiple offender proceedings are invalid because neither the underlying offense of armed robbery, nor the subsequent multiple offender allegation was charged by grand jury indictment. Consequently, the defendant argues the court was without jurisdiction to impose a life sentence.
The State counters that jurisprudence is clear that, although La. Const. Art. 1 § 15 requires the use of grand jury indictments to institute prosecution when the penalty is either a death sentence or life imprisonment, that requirement is not applicable to multiple offender proceedings. The defendant acknowledges that line of jurisprudence, but asks this Court to revisit the issue.
La. Const. Art. 1 § 15 provides in part:
Prosecution of a felony shall be initiated by indictment or information, but no person shall be held to answer for a capital crime or a crime punishable by life imprisonment except on indictment by a grand jury.
La.C.Cr.C. Art. 382(A) provides in pertinent part that;
A prosecution for an offense punishable by death, or for an offense punishable by life imprisonment, shall be instituted by indictment by a grand jury. Other criminal prosecutions in a district court shall be instituted by indictment or by information.
Our Supreme Court in State v. Alexander, 325 So.2d 777, 778-779 (La. 1976) has made it clear that the constitutional requirement of a grand jury indictment in capital cases or cases punishable by life imprisonment does not apply to the institution of enhanced-penalty proceedings under La. R.S. 15:529.1. Id. The grand jury's function is to inquire into an offense and to indict for an offense if the evidence so indicates. Id. at 779. The Alexander court explained that the classification of felonies for initiation of prosecution is "founded upon the general penalty *526 applicable to the substantive crime charged . . . not upon any enhanced penalty to which any particular individual might be subject because of his prior convictions". ......... Post-conviction enhanced-penalty proceedings have no functional relationship to the innocence or guilt of the crime for which prosecution is initiated either by grand jury indictment or by information. Id.
This court has previously considered a defense argument that the State should have re-instituted proceedings against a defendant by Grand Jury Indictment in State v. Collins, 44-1443 (La.App. 5 Cir. 7/26/05), 910 So.2d 454. In rejecting the defendant's argument that a grand jury indictment was required, this court followed the law in State v. Alexander, supra, stating;
The jurisprudence is clear that the classification of felonies for initiation of prosecution is based on the penalty applicable to the substantive crime and not the enhanced penalty to which a defendant might be subjected. In the present case, defendant was charged with armed robbery and first degree robbery, neither of which requires a life sentence. La. R.S.14:64 and 14:64.1. Therefore, initiation of prosecution is either by indictment or by bill of information. State v. Collins, 910 So.2d at 463-464
The defendant argues this court should reconsider State v. Alexander, which is a Louisiana Supreme Court decision, due to more recent jurisprudence, including U.S. v. Booker, 543 U.S. 220, 238, 125 S.Ct. 738, 752, 160 L.Ed.2d 621 (2005) which noted "[t]he Framers would not have thought it too much to demand that, before depriving a man of [ten] more years of his liberty, the State should suffer the modest inconvenience of submitting its accusation to `the unanimous suffrage of twelve of his equals and neighbours,' rather than a lone employee of the State." (citing Blakely v. Washington, 542 U.S. 296, 313-314, 124 S.Ct. 2531, 2543, 159 L.Ed.2d 403 (2004)).
Defendant contends this Court should reconsider whether the true intent of the legislature was to require a grand jury decision on cases in which a defendant might be punishable by death or life imprisonment, noting that the constitution is clear that a single district attorney or his assistant should not be making this decision alone. He argues to the extent that La. R.S. 15:529.1 allows the district attorney to subject a defendant to a life sentence by multiple offender bill of information, it is in conflict with the constitution and that portion of the statute should be declared unconstitutional.
The constitutionality of a statute cannot be raised for the first time on appeal. An attack upon the constitutionality of a statute must first be presented in the trial court. Williams v. State, Dept. of Health and Hospitals, 95-0713 (La.1/26/96), 671 So.2d 899, 901. A party contesting the constitutionality of a statute has a three-tier burden. The presentation must be made in the trial court, the unconstitutionality must be specially pleaded, and the grounds for the claim particularized. Id.
In the instant case, the defendant filed a motion to quash based on the failure of the State to present the matter to a grand jury. The defendant also maintained that the multiple bill proceedings denied him due process of law since it denied him a jury trial and the requirement of proof beyond a reasonable doubt. We find that insufficient to meet the three-tier burden set forth in Williams. There is no specific assertion that La. R.S. 15:529.1 is unconstitutional, and there are no specific, particularized grounds for the *527 assertion. Accordingly, the constitutionality of La. R.S. 15:529.1 is not properly before this Court and will not be addressed.
We find the jurisprudence in State v. Alexander, supra and State v. Collins, supra is controlling in this matter and we find no merit in the defendant's assignment of error.
The record was reviewed for errors patent, according to La.-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). We note that the initial bill of information charging the underlying offense of armed robbery indicated incorrectly that the offense was committed on July 14. When the bill was read at trial, the State realized the date was incorrect and amended the bill to allege the offense was committed on July 4. The defendant request for a re-arraignment was denied. We find no error in that decision.
Although the bill of information was amended after trial began, the amendment of the date of the offense related to a defect of form. This Court has recognized when the date is not an essential element of the offense charged, a mistake respecting the date on which the offense occurred is only a defect as to form, which may be corrected at any time without leave of court. State v. Jackson, 04-306 (La.App. 5 Cir. 8/31/04), 882 So.2d 613, 618. Accordingly, we find the trial court did not err in refusing the defendant's request for re-arraignment.
We have found a second error which requires correction. We note that the minute entry of this hearing states that the defendant was found guilty "under R.S. 15:529.1 on count 1", and found to be a multiple offender, the transcript clearly indicates that the trial court found the defendant to be a "triple felony offender" based on his two pleas of guilty on the possession of cocaine charges. When there is a discrepancy between the minute entry and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732 (La.1983). We hereby order the trial court to correct the minute entry to conform with the transcript.
For the reasons assigned herein, we affirm the defendant's conviction and sentence. The matter is remanded to the trial court with an order to correct the minute entry of the conviction and sentence on the multiple offender bill in accordance with the opinion.
AFFIRMED; REMANDED WITH ORDER.
NOTES
[1] The bill of information was amended to correct the date of the offense before the trial began. See: errors patent discussion.
[2] We note that the minute entry of this hearing states that the defendant was found guilty "under R.S. 15:529.1 on count 1", and found to be a multiple offender, the transcript clearly indicates that the trial court found the defendant to be a "triple felony offender" based on his two pleas of guilty on the possession of cocaine charges. When there is a discrepancy between the minute entry and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732 (La.1983). See: errors patent discussion.
[3] Mr. Williams did not mention Torian's last name in his testimony. Torian's full name was gleaned from other evidence contained in the record.
[4] Rick Moore is also referred to as "Billy Moore."
[5] It is noted that a writ, no. 06-2529 was filed in this case with the Louisiana Supreme Court on October 20, 2006 (postmarked October 19, 2006).