MARION F. EDWARDS, Judge.
 

 12Pefendant-appelIant, Leo Mitchell (“defendant”), appeals his convictions and sentences on one count of second degree murder, one count of attempted second degree murder, and one count of second degree kidnapping. For reasons that follow, we affirm the convictions and sentences.
 

 Defendant was originally charged by Grand Jury Indictment dated June 1, 2000 with the first degree murder of Henry Porter, Sr. A sanity commission was appointed and, ultimately, defendant was found competent to stand trial. On June 23, 2005, the indictment was amended to reduce the charge to second degree murder. On December 22, 2005, all charges were dismissed, and new charges were filed. In a second Grand Jury Indictment, defendant was charged with the second degree murder of Henry Porter, Sr., the attempted second degree murder of Howard Bardell, and the second degree kidnapping of Elena Smith.
 

 | .¡In due course, all three counts of criminal activity were tried before a jury. Defendant was found guilty as charged on all the counts. He was sentenced to serve life in prison at hard labor on count one, fifty years on count two, and thirty years on count three. The court ordered the sentences to be served concurrently without benefit of parole, probation, or suspension. On that same day, the State filed a multiple bill of information against defendant. Defendant filed a motion to reconsider the sentence and a timely motion for appeal.
 

 FACTS
 

 In April of 2000, Henry Porter, Sr. (“Mr. Porter”) lived with his wife, Evangeline Porter (“Mrs. Porter”), their two children, Howard Bardell (“Howard”) and Elena Smith (“Elena”), and Elena’s two-year-old daughter. The family lived in a small, three-room shotgun home in Kenner. Mr. and Mrs. Porter slept in the front room, and Howard, Elena, and the child slept in the second room of the home.
 

 Early in the morning hours of April 2, 2000, Elena’s ex-boyfriend, the defendant herein, entered the home while all family members who were home at the time were asleep.
 
 [1]
 
 Elena awoke to find defendant standing over her bed pointing a gun to her head. She screamed and awakened her brother, Howard, and her father, Mr. Porter. Howard, who was sixteen years old at the time, ran toward his parents’ bedroom. Defendant began firing, hitting both Mr. Porter and Howard. At the end of the gunfire, Mr. Porter lay dead from his wounds and Howard, who was shot twice, lay injured on the floor.
 

 Defendant then grabbed Elena and ordered her to get her car keys, telling her she must come with him. Elena told defendant she did not have the car keys. 14After an unsuccessful search for the keys, defendant dragged Elena out of the house and through a wooded area in the rear of the home.
 

 
 *724
 
 Howard was able to get to the phone and call relatives who lived nearby. The relatives came over and kicked in the door to find Mr. Porter dead and Howard injured. A call to 911 brought police officers to the home shortly afterward.
 

 Sometime later, State Trooper Omar Landrum (“Trooper Landrum”), who was working a detail on Airline Highway, saw a taxi go by with a man and a woman in the back seat. The woman was staring at him in a way that caught his attention. Trooper Landrum had just gotten the report about the shooting and kidnapping nearby and a description of defendant and Elena, so he stopped the taxi cab to investigate. At that point, Elena got out of the cab and on the ground as instructed by Trooper Landrum. Defendant did not obey the command and began to run. Trooper Landrum got into his car and followed defendant through the streets of Kenner, eventually apprehending him in the 700 block of Williams Boulevard.
 

 Elena told officers that she saw defendant throw the gun away and led officers to a convenience store nearby. A search of the area pointed out by Elena produced a gun, which later proved to be the gun used in the shooting.
 

 LAW
 

 In brief to this Court, defendant assigns two errors for our review. The first assignment questions the sufficiency of evidence used to convict defendant. The second assignment made in a supplemental brief relates to the trial court’s denial of defendant’s challenges for cause. When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of Isthe evidence by considering the entirety of the evidence.
 
 [2]
 
 If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary.
 
 [3]
 
 Accordingly, we will consider defendant’s arguments relating to the sufficiency of evidence first.
 

 The constitutional standard for testing the sufficiency of the evidence requires that a conviction be based on proof sufficient for any rational trier-of-fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt.
 
 [4]
 

 In defendant’s case, the State was required to prove the elements of three separate offenses: second degree murder, attempted second degree murder, and second degree kidnapping.
 

 The State set out to prove the defendant had specific intent to kill or to inflict great bodily harm in seeking the convictions on the charges of second degree murder and attempted second degree murder. Proof of that specific intent meets the definition of second degree murder.
 
 [5]
 
 Further, “[a]ny person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intend
 
 *725
 
 ed....”
 
 [6]
 

 To prove second degree murder, the State must prove that defendant had the specific intent to kill or to inflict great bodily harm. To prove attempted second degree murder, the State must establish, beyond a reasonable doubt, that the defendant specifically intended to kill a human being and that he committed an | overt act in furtherance of that goal.
 
 [7]
 
 Specific intent to inflict great bodily harm is sufficient to support a murder conviction, but attempted second degree murder requires a specific intent to kill.
 
 [8]
 

 Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.
 
 [9]
 
 Specific intent need not be proven as a fact, but may be inferred from the circumstances surrounding the offense and the conduct of the defendant.
 
 [10]
 
 The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier-of-fact that the defendant acted with specific intent to kill.
 
 [11]
 
 Whether a defendant possessed the requisite intent in a criminal case is a question for the trier-of-fact, and a review of the correctness of this determination is guided by the
 
 Jackson
 
 standard.
 
 [12]
 

 In our review of the facts and the applicable law, we find support for the jury’s decision that the State adequately proved all of the essential elements of all three crimes.
 

 However, that finding does not end our review of the sufficiency of evidence. Defendant does not claim that the State failed to prove any of the elements of second degree murder or attempted second degree murder. Rather, defendant’s argument in challenging the sufficiency of the evidence is based on the issue of identification of the perpetrator. Defendant’s theory is that Elena paged him and let him into the house. It was Elena who killed Mr. Porter and attempted to kill Howard. Defendant supports this theory by pointing out that there was no ^evidence of forced entry into the house and that Mr. Porter was intoxicated and had traces of cocaine and anti-depressants in his blood at the time of his death. Defendant also points out that police were unable to identify the gun’s owner, no fingerprints were recovered from the gun, and no gunshot residue testing was done to establish whether or not he or Elena fired a gun. Defendant further argues that, although Howard testified that he saw defendant standing over Elena’s bed with a gun, Howard ran and did not actually see who shot him in the back.
 

 The State must prove the defendant’s identity as the perpetrator in addition to proving the statutory elements of the charged offense at trial.
 
 [13]
 
 As a general rule, when the key issue is the defendant’s identity as the perpetrator,
 
 *726
 
 rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification.
 
 [14]
 
 Positive identification by one witness is sufficient to support a conviction.
 
 [15]
 

 Ballistics testimony showed the bullet that killed Mr. Porter was fired from the .38 caliber revolver found in the wooded lot. A lead projectile consistent with that gun was also recovered from the victims’ home.
 

 Officer William Ceravola, the crime scene technician, testified he processed the revolver for fingerprints but was unable to locate any latent prints on it. The officer explained that he has never been able to lift a usable fingerprint from a gun; that it is difficult to obtain prints from such surfaces. Officer Ceravola testified that he did not perform gunshot residue tests on any witnesses in this case because, at the time of the shootings, it was the policy of the Kenner Police Department not to do such testing.
 

 1 ROfficer Danny Kilian (“Officer Kilian”) of the Kenner Police Department testified that he was dispatched to the victims’ home on the morning of the shooting in response to a 911 call. When he arrived at the scene, he found the front door kicked open and two men lying on the floor. One man, later identified as Howard, was responsive. Thelma LeBeaux, Howard’s aunt, was also at the scene. Based on the statements from Howard and his aunt, Officer Kilian identified defendant as a suspect in the shooting and sent out his description to fellow police officers.
 

 Officer Kilian was informed later that a suspect fitting the description had been apprehended on Williams Boulevard by a state trooper. Officer Kilian proceeded to that site to find defendant lying on the ground with his hands handcuffed behind his back. Defendant stated that his name was Leo Mitchell and that he had been kidnapped with Elena from her residence by an unknown man and taken into the woods. Defendant also stated that the unknown male shot Mr. Porter and Howard. Officer Kilian also testified that Elena was wearing only a long T-shirt and underwear and had multiple scratches about her legs and arms.
 

 State witnesses, who were members of the victims’ family, knew defendant, as he had dated Elena for more than a year. There was testimony that defendant had visited the Porter home on occasion. Both Elena and her brother, Howard, testified they saw defendant in their bedroom. Elena testified defendant held a gun to her face. Elena also testified that she actually saw defendant shoot both Mr. Porter and Howard. Howard testified that he saw something in defendant’s hand that looked like a gun. Howard did not see who shot him because he was shot in the back as he was running away. However, Howard clearly believed defendant was the shooter, since he said as much to his aunt, Thelma LeBeaux, when he called her for help. Moreover, Howard did not see Elena or Mr. Porter with a gun | aor any kind of weapon, and Officer Killian, the first police officer to arrive at the murder scene, testified he did not find any weapons there.
 

 Defendant argues that the State did not establish a point of forced entry into the house, suggesting that Elena allowed him into the house willingly. He maintains that, since the State did not produce fingerprint evidence from windows or door
 
 *727
 
 knobs, it failed to show how he could have entered the Porter home without Elena’s consent.
 

 Mrs. Porter testified that she locked the doors before she left the house for work on the morning of the shootings. The front door was still locked when the LeBeaux family arrived in response to Howard’s telephone call. It was the LeBeaux family who kicked in the front door after getting the frantic call from Howard. Officer Kil-lian testified that he could not identify the perpetrator’s point of entry. His investigation showed the front door had been kicked open by the relatives who came to Howard’s aid. However, one of crime scene photographs depicts a ladder propped under a window on the side of the residence. Testimony of Mrs. Porter establishes that the window had no glass in it and was covered by plastic.
 

 It is clear from the testimony of police officers that defendant made statements at the time of his arrest that were inconsistent with subsequent statements made at police headquarters. Defendant told one detective that he went out on the night of April 1, 2000, and into the morning of April 2. A friend dropped him off at a convenience store on Airline Highway. While in the parking lot outside of the store, he saw Elena emerge from the nearby woods. Defendant said he crossed Airline Highway and escorted Elena toward the store. According to defendant, his meeting with Elena that morning was coincidental. He denied having shot anyone, and he did not admit to having a gun that day or to being in | inthe house where the crime occurred. Defendant also denied having kidnapped Elena. Defendant said Elena was responsible for the shootings; that she wanted her stepfather dead because he was interfering with her relationship with defendant.
 

 At the time of his arrest, defendant claimed Elena secretly admitted him to the house and an unknown man came in and shot Howard and Mr. Porter and took defendant and Elena out of the house. Elena, however, testified there were no strangers in the house at the time of the incident, only family members. Elena also testified that defendant told her, “ T didn’t mean to shoot those people.’ ”
 

 Defendant later told an officer that Elena was the shooter and that she had killed Mr. Porter because he was interfering with Elena’s relationship with defendant. Elena, on the other hand, testified she did not have any trouble with Mr. Porter. Defendant then contradicted himself by stating he was never in the Porter residence on the morning of crime.
 

 Defendant argues that the evidence showed Elena could have contacted him prior to the incident and invited him to her house. But Elena testified that she did not call or speak with defendant on April 2, 2000. Detective Chad Jacquet testified that the pager recovered at the Airline Highway scene, purportedly belonging to defendant, contained the telephone number for the Porter residence. But, the pager did not show the dates and times of the calls made.
 

 Defendant points to testimony that Mr. Porter had alcohol, cocaine, and other drugs in his system at the time of his death. He suggests the victim’s condition might have contributed to the shooting. Such supposition is refuted by Mrs. Porter’s testimony that Mr. Porter was asleep in his bed when she left for work at 3:45 on the morning of the shootings.
 

 ■J^Defendant suggests that Elena’s ability to direct police officers to the location of the murder weapon was an inference that it was she who abandoned it. There is simply no evidence in the record to support that assertion. Elena’s testimony
 
 *728
 
 that defendant had the gun, and that it was he who discarded it in the wooded area, was unchallenged.
 

 Both the direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt.
 
 [16]
 
 The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.
 
 [17]
 
 Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts.
 
 [18]
 

 Based on the foregoing, we find the State negated any reasonable probability of misidentifícation. Moreover, when presented with all the evidence, the jury could have reasonably determined defendant was the shooter. We do not find the State’s failure to link the gun to defendant by way of fingerprint evidence rendered the overall evidence that defendant was the shooter insufficient. The evidence produced by the State, while circumstantial in nature, provided a basis for the jury’s finding that the defendant possessed the weapon.
 
 [19]
 
 The evidence at trial in this case, both direct and circumstantial, supports the jury’s finding that defendant was the shooter, even absent evidence such as fingerprints and gunshot residue testing.
 

 In finding the defendant guilty of second degree murder and attempted second degree murder, the jurors clearly found the State’s witnesses more credible | l2than defendant’s conflicting statements to police. It is not the function of the appellate court to assess the credibility of witnesses or to re-weigh the evidence.
 
 [20]
 
 Here, we find the evidence at trial sufficient under
 
 Jackson
 
 to support the State’s charge that defendant was the perpetrator, and that he is guilty of second degree murder and attempted second degree murder.
 

 Defendant was also convicted of second degree kidnapping, which is defined, in pertinent part, as follows:
 
 [21]
 

 A. Second degree kidnapping is the doing of any of the acts listed in Subsection B wherein the victim is:
 

 (2) Used to facilitate the commission of a felony or the flight after an attempt to commit or the commission of a felony;
 

 (3) Physically injured or sexually abused;
 

 (5) Imprisoned or kidnapped when the offender is armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon.
 

 B. For purposes of this Section, kidnapping is:
 

 (1) The forcible seizing and carrying of any person from one place to another; or
 

 (2) The enticing or persuading of any person to go from one place to another[.]
 

 Elena testified that defendant held a gun to her face in her bedroom. After
 
 *729
 
 shooting her brother and stepfather, defendant ordered her, at gunpoint, to find the keys to her car. When Elena could not find the keys, defendant grabbed her and forced her, at gunpoint, to leave the house with him through the back door.
 

 Howard, who was lying injured on the floor, heard defendant tell Elena to “[m]ove your ass.” Jurors could have reasonably determined, based on that testimony, that defendant forcibly seized Elena and used her to facilitate his flight from the murder scene. Moreover, defendant was armed with a dangerous weapon.
 

 11sElena testified that defendant forced her to go into the woods behind her house with him. She sustained scrapes and cuts as he pulled her along, such that she required treatment by an emergency medical technician. Elena further testified that when she and defendant passed a house where they could see the occupant through the kitchen window, defendant threatened to shoot Elena and the man if she screamed for help. When Elena feigned an injury to her ankle, defendant told her, “You better get up, bitch. You better get up and come on before I shoot you.” At that point, defendant still had his gun. Elena further testified that, while defendant was pulling her through the woods, he told her that if they were caught, she was to tell police he was trying to rescue her.
 

 The evidence showed defendant continued to use force against Elena. Elena testified that, even after defendant discarded the murder weapon in the woods, she thought he might have another weapon with him. For that reason, she felt forced to get into the cab with him.
 

 Elena’s expression when she looked at Trooper Landrum from the cab was such that he was prompted to investigate. Trooper Landrum testified that Elena looked at him without blinking, with a dead kind of expression. At that point, it crossed his mind that the couple in the cab might be the ones for whom the Kenner officers were searching. The trooper’s testimony lent support to Elena’s testimony that she felt forced to go with defendant.
 

 The victim’s testimony alone is sufficient to prove the elements of the offense.
 
 [22]
 
 In this matter, however, the victim’s testimony was corroborated by a state trooper and a Kenner police officer.
 

 |14We agree with the jury’s verdict that, viewed in the light most favorable to the prosecution, the State presented sufficient evidence to convict defendant of second degree kidnapping.
 

 This assignment is without merit.
 

 In a supplemental assignment of error, defendant complains that the trial court erred in denying his challenges for cause as to prospective jurors Joseph Johnson, Donald Mathas, and Luisa Isaba. As a result, he was forced to use peremptory challenges to excuse those individuals, and he ultimately exhausted his twelve peremptory challenges.
 

 The State concedes that defendant exhausted his peremptory challenges but argues the trial court did not err in denying defendant’s challenges for cause as to the three prospective jurors at issue.
 

 In trials of offenses punishable by death or necessarily by imprisonment at hard labor, each defendant has twelve peremptory challenges, and the State has twelve peremptory challenges per defendant.
 
 [23]
 

 
 *730
 
 Article I, § 17 of the Louisiana Constitution guarantees that “[t]he accused shall have a right to full voir dire examination of prospective jurors and to challenge jurors peremptorily.” A district court’s erroneous ruling depriving a defendant of a peremptory challenge substantially violates that defendant’s rights and constitutes reversible error.
 
 [24]
 
 "1 Prejudice is presumed when the trial court erroneously denies a challenge for cause, and the defendant ultimately exhausts his peremptory challenges.
 
 [25]
 
 Thus, to prevail on appeal, a defendant must demonstrate 1) erroneous denial of his challenge for cause, and 2) use of all his peremptory 11schallenges
 
 [26]
 
 Additionally, the defendant must show that, when the trial court denied his challenge for cause, he used one of his peremptory challenges curatively to remove that juror, thereby reducing his number of peremptory challenges, or waive the issue on appeal. This is so even in a case where the defendant uses all of his peremptory challenges.
 
 [27]
 
 A trial court is given broad discretion in ruling on challenges for cause, and such rulings will only be reversed when a review of the entire voir dire reveals the trial court abused its discretion.
 
 [28]
 

 The record in this case reflects that defendant did, in fact, exhaust all of his peremptory challenges. He also used peremptory challenges to excuse the three prospective jurors at issue here. Therefore, defendant’s complaint as to the trial court’s refusal to grant his challenges for cause is properly before this Court. The question on appeal is whether the trial court erroneously denied defendant’s challenges for cause as to those three prospective jurors.
 

 Prospective Juror Joseph Johnson
 

 Defendant maintains the trial court erred in denying his cause challenge of Joseph Johnson (“Mr. Johnson”), whom defendant argues could not be an impartial juror in this case because his father had been murdered four years earlier. The State responds that Mr. Johnson’s answers to voir dire questions regarding his father’s murder showed he could be a fair and impartial juror.
 

 LSAS-C.Cr.P. art. 797 provides, in pertinent part:
 

 The state or the defendant may challenge a juror for cause on the ground that:
 

 [[Image here]]
 

 (2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, 11(ithat he can render an impartial verdict according to the law and the evidence^]
 

 During voir dire, Mr. Johnson stated he is retired from the United States Air Force and is employed as an information systems analyst. When the trial judge asked him whether he or someone in his family had been a victim of crime, Mr. Johnson replied that his father had been
 
 *731
 
 murdered four years earlier. The judge asked Mr. Johnson whether his father’s murder would affect his ability to serve as a fair and impartial juror in this case, and Mr. Johnson replied, “I don’t know.” The judge then told him, “I could understand that, and we’re going to let you be questioned by these attorneys and they’ll let you talk about the case and the type of case it is, and you know, if there’s a problem you need to tell us, okay?” Mr. Johnson replied, “Okay.”
 

 Later, when questioned by the prosecutor, Mr. Johnson stated he would not hold the fact that his father had been murdered against defendant. He said he could be fair and impartial to the State and the defense. Mr. Johnson further indicated that, if the State proved its case at trial, he could return a verdict of guilty.
 

 When questioned by defense counsel, Mr. Johnson stated his father was a cab driver, and that he had been found with a knife in his throat. His father’s killer had not been apprehended. Mr. Johnson said the fact that someone got away with killing his father would not weigh on his mind if he were seated on defendant’s jury. Mr. Johnson commented that defendant had not killed his father and what had happened to his father had no bearing on defendant’s case. Mr. Johnson told defense counsel he could understand his concerns about his sitting on the jury. Speaking to how he would handle sitting on the jury in this case, Mr. Johnson said, “From my standpoint, it doesn’t phase [sic] me in the least.”
 

 |17In challenging Mr. Johnson for cause, defense counsel pointed out that, at first, Johnson said he did not know if he could be impartial due to his father’s murder. Mr. Johnson then said he could be fair. The prosecutor responded that Mr. Johnson also said he would not hold against defendant the fact that his father had been murdered.
 

 The trial judge denied the challenge for cause, stating:
 

 All right. I listened very carefully to his responses in voir dire to those questions. My concerns were heightened because of him telling me during my questioning of him that his father had been the victim of a murder approximately four years ago.
 

 Mr. Johnson consistently answered that he could listen to the evidence and the testimony and the instructions of law in this case and reach a fair and impartial decision based upon the instructions, evidence, and testimony in this case. He answered that question numerous times.
 

 Defense counsel objected to the court’s ruling. He then used a peremptory challenge to excuse Mr. Johnson.
 

 The Louisiana Supreme Court has found that a prospective juror who has been the victim of a crime, or whose family member has been the victim of a crime similar to the one with which the defendant is charged is not prohibited from serving on the jury, provided the crime has not affected his or her objectivity.
 
 [29]
 
 While Mr. Johnson initially expressed uncertainty about whether he could remain fair and impartial, he was later decisive in saying he could follow the law and give a fair hearing to both sides.
 

 When a juror expresses a predisposition as to the outcome of a trial, a challenge for cause should be granted. Yet, if after subsequent questioning, or rehabilitation,
 
 *732
 
 the juror exhibits the ability to disregard previous views and make a decision based on the evidence presented at trial, the challenge is properly denied. 1 iSWhen assessing whether a challenge for cause should be granted, the district judge must look at the juror’s responses during his or her entire testimony, not just “correct” isolated answers or, for that matter, “incorrect,” isolated answers.
 
 [30]
 

 Mr. Johnson’s responses, as a whole, showed he could be a fair and impartial juror and that he could put aside the fact that his father was murdered if he were seated on the jury. The trial court did not err in denying defendant’s cause challenge of Mr. Johnson.
 

 Prospective Juror Donald Mathas
 

 Defendant challenged Donald Ma-thas (“Mr. Mathas”) for cause because he commented the charge against defendant should be first degree rather than second degree murder. Defendant further argues that Mr. Mathas seemed to feel that defendant should testify at trial, despite the Fifth Amendment privilege against self-incrimination. Finally, defendant argues Mr. Mathas said he would not be able to focus his attention on the trial because he would be missing work.
 

 The State responds that, in the trial court, defendant’s only stated basis for defendant’s cause challenge of Mr. Mathas was that he would be distracted by his work obligations. The State argues that defendant is limited on appeal to the issue he raised below. The State further argues that defendant is not entitled to reversal on any of the grounds he now raises regarding Mr. Mathas.
 

 Mr. Mathas stated during voir dire that he is married and has a son. He works for the telephone company. He said if the State proved its case, he could find defendant guilty. Mr. Mathas asked what the distinction is between first degree murder and second degree murder. The judge responded that he would instruct the jury as to the law applicable to second degree murder, the crime with which defendant was charged and that the jurors need only be concerned with |¶ ¿whether or not the State proved the elements of that offense. Mr. Mathas then commented that there did not appear to him to be much of a difference between a second degree murder and a death penalty case. The prosecutor explained the concept of specific intent as it applies to second degree murder and asked Mr. Mathas whether the explanation answered some of his questions. Mr. Mathas responded, “Correct.”
 

 Mr. Mathas told the court that, under normal circumstances, he would be able to give the trial his undivided attention. But he was currently so busy with his work for the telephone company in the post-Katrina environment that he would not be able to concentrate during a three to four-day trial. Mr. Mathas said he also had plans to help his in-laws move residences. When questioned further about those obligations, Mr. Mathas said he thought arrangements could be made so that he could miss work, and, if family arrangements could be made, he would be able to give his full attention to the trial.
 

 When defense counsel asked Mr. Mathas whether he understood defendant’s privilege against self-incrimination, Mr. Mathas responded that he understood the law, but that he personally would want to testify if he were charged with such a serious offense. He felt that someone charged with this type of crime should try to defend himself. Mr. Mathas further stated he would not hold it against someone if he did not want to take the stand in his own
 
 *733
 
 defense. Mr. Mathas said he understood that, if jurors mentioned defendant’s failure to testify during deliberations, the court would have to be notified.
 

 When defense counsel challenged Mr. Mathas for cause, he argued only that Mr. Mathas’ outside obligations would affect his ability to concentrate on the evidence. The prosecutor countered that Mr. Mathas said he could be a fair and | .^impartial juror and that he could make arrangements to take care of his work and family issues. In denying defendant’s challenge for cause, the trial judge stated:
 

 All right. The Court is not going to excuse Mr. Mathas. What I heard Mr. Mathas say is that although he had some things that, you know, he could be doing with i’egard to either his employment or with regard to having to meet a plumber, that it wasn’t a life threatening issue and that he would not allow it to distract from his duty in this case.
 

 Defendant objected to the court’s ruling. He subsequently used a peremptory challenge to dismiss Mr. Mathas.
 

 A defendant is limited to the grounds for objection that he articulated in the trial court, and a new basis for the objection may not be raised for the first time on appeal.*
 
 [31]
 
 As the State points out, defendant only based his cause challenge of Mr. Mathas on the distractions arising from Mr. Mathas’ job and family obligations, and the trial court based its ruling on that argument alone. Accordingly, defendant did not preserve for appeal any of his other arguments regarding Mr. Ma-thas.
 

 We find that the trial court did not err in denying defendant’s challenge for cause based on Mr. Mathas’ concern that his job and family obligations would prevent him from giving his full attention to the trial. Mr. Mathas ultimately indicated he could be a fair and impartial juror, and he believed he could find ways to handle his work and family duties so that he could focus his attention on the evidence at trial.
 
 [32]
 
 We find no merit in this argument.
 

 Prospective Juror Luisa Isaba
 

 Defendant challenged prospective juror Luisa Isaba (“Ms. Isaba”) on the basis of a language barrier prevented her from serving effectively on a jury. The State responds that the record demonstrates Ms. Isaba’s English skills were good enough to qualify her for jury service. It appears she was able to understand the |2ilaw as it was explained to her and to effectively answer the questions she was asked.
 

 Ms. Isaba stated she is married, has two children, and works as a housekeeper. Her husband is a taxi driver and law student. Ms. Isaba said no one in her family had been a victim of crime, and she did not know of any reason she could not be a fair and impartial juror. She said if the State met its burden of proving guilt beyond a reasonable doubt, she could return a verdict of guilty as charged.
 

 Ms. Isaba said she is from Nicaragua. She does not read a lot of English, but she understands a lot of it. She said she thought she would be able to follow the trial and understand what was being said. She stated she was able to understand what the district attorney had said during voir dire. When the prosecutor asked her whether she would be able to read, on her
 
 *734
 
 own, any English language documents presented to her during trial, she answered, “Yes.”
 

 Defense counsel challenged Ms. Isaba for cause, arguing there was a possible language barrier that would prevent her from understanding the trial proceedings. The prosecutor countered that Ms. Isaba had demonstrated a level of proficiency in English sufficient to effectively serve as a juror. In denying defendant’s challenge of Ms. Isaba, the trial court stated:
 

 Ms. Isaba was read the qualifications for service as a juror. She did not indicate that she would have any difficulty with the English language. During the process of voir dire, she was also questioned about her ability with the English language. She said that she understood English, that she had understood everything that had been said to her so far.
 

 And that if a document was presented to her in English, that she could read it. The Court will not excuse Ms. Isaba for cause.
 

 |22In order to serve as a juror, a person must be able to read, write, and speak the English language and be possessed of sufficient knowledge of the English language.
 
 [33]
 
 The question of a juror’s qualifications is addressed to the sound discretion of the trial judge within the bounds prescribed by law; and, although the trial judge’s ruling in these matters is subject to review, it will not be disturbed in the absence of clear abuse.
 
 [34]
 

 There is nothing in the record that shows the trial court abused its discretion in finding Ms. Isaba suitable to serve as a juror. In response to questioning, she stated several times that she was proficient enough in reading and in understanding the English language to understand the proceedings at trial. She said she understood what had gone on during voir dire. Her answers to the attorneys’ questions were appropriate and demonstrated her understanding of what was being asked. Since he saw and heard Ms. Isaba, the trial judge was in the best position to determine whether or not she was capable of serving on a jury.
 

 Accordingly, the trial court did not err in denying any of the three challenges for cause at issue here. This assignment of error lacks merit.
 

 For the foregoing reasons, we affirm defendant’s convictions and sentences.
 

 AFFIRMED.
 

 [1]
 

 . Mrs. Porter had left earlier for her job at a nearby nursing home.
 

 [2]
 

 .
 
 State v. Hearold,
 
 603 So.2d 731, 734 (La. 1992);
 
 State v. Austin,
 
 04-993 (La.App. 5 Cir. 3/1/05), 900 So.2d 867, 875,
 
 writ denied,
 
 2005-0830 (La. 11/28/05), 916 So.2d 143.
 

 [3]
 

 .
 
 Id.
 

 [4]
 

 .
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
 

 [5]
 

 . LSA-R.S. 14:30.1;
 
 See, State v. Lewis,
 
 05-170 (La.App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90,
 
 writ denied,
 
 06-0757 (La. 12/15/06), 944 So.2d 1277.
 

 [6]
 

 . LSA-R.S. 14:27.A.
 

 [7]
 

 .
 
 State v. Hebert,
 
 05-1004 (La.App. 5 Cir. 4/25/06), 930 So.2d 1039, 1046.
 

 [8]
 

 .
 
 Id.
 
 at 1046-47.
 

 [9]
 

 . LSA-R.S. 14:10(1).
 

 [10]
 

 .
 
 State v. Graham,
 
 420 So.2d 1126, 1127 (La. 1982);
 
 State v. Young,
 
 05-702 (La.App. 5 Cir. 2/14/06), 938 So.2d 90, 95.
 

 [11]
 

 .
 
 State v. Gant,
 
 06-232 (La.App. 5 Cir. 9/26/06), 942 So.2d 1099, 1111, writ
 
 denied,
 
 06-2529 (La.5/4/07), 956 So.2d 599.
 

 [12]
 

 .
 
 State v. Spears,
 
 05-0964 (La.4/4/06), 929 So.2d 1219, 1224.
 

 [13]
 

 .
 
 State v. Draughn,
 
 05-1825 (La. 1/17/07), 950 So.2d 583, 593,
 
 cert. denied,
 
 - U.S. -, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007).
 

 [14]
 

 .
 
 Id.
 
 (quoting
 
 State v. Neal,
 
 00-0674 (La.6/29/01), 796 So.2d 649, 658,
 
 cert. denied,
 
 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002)).
 

 [15]
 

 . State
 
 v. Han'is,
 
 07-124 (La.App. 5 Cir. 9/25/07), 968 So.2d 187, 193.
 

 [16]
 

 .
 
 State v. Harrell,
 
 01-841 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019.
 

 [17]
 

 . LSA-R.S. 15:438.
 

 [18]
 

 .
 
 State v. Kempton,
 
 01-572 (La.App. 5 Cir. 12/12/01), 806 So.2d 718, 722.
 

 [19]
 

 .
 
 See, State v. Patterson,
 
 588 So.2d 392 (La.App. 4 Cir. 1991).
 

 [20]
 

 .
 
 State v. Theriot,
 
 07-71 (La.App. 5 Cir. 6/26/07), 963 So.2d 1012, 1021,
 
 writ denied,
 
 07-1598 (La.2/1/08), 976 So.2d 715.
 

 [21]
 

 . LSA-R.S. 14:44.1.
 

 [22]
 

 .
 
 State v. Issac,
 
 97-497 (La.App. 5 Cir. 10/28/97), 702 So.2d 320.
 

 [23]
 

 . LSA-C.Cr.P. art. 799.
 

 [24]
 

 .
 
 State v. Lindsey,
 
 06-255 (La. 1/17/07), 948 So.2d 105, 107;
 
 State v. Mickel,
 
 07-47 (La.App. 5 Cir. 5/29/07), 961 So.2d 516, 522,
 
 writ denied,
 
 07-1422 (La. 1/7/08), 973 So.2d 732.
 

 [25]
 

 .
 
 State v. Campbell,
 
 06-0286 (La.5/21/08), 983 So.2d 810, 856;
 
 State v. Hensley,
 
 04-617 (La.App. 5 Cir. 3/1/05), 900 So.2d 1,
 
 writ denied,
 
 05-0823 (La.6/17/05), 904 So.2d 683.
 

 [26]
 

 .
 
 Lindsey, supra; Hensley, supra.
 

 [27]
 

 .
 
 State v. Campbell,
 
 983 So.2d at 856.
 

 [28]
 

 .
 
 State v. Mickel,
 
 961 So.2d at 522-23.
 

 [29]
 

 .
 
 State v. Harris,
 
 01-2730 (La.1/19/05), 892 So.2d 1238, 1261,
 
 cert. denied,
 
 546 U.S. 848, 126 S.Ct. 102, 163 L.Ed.2d 116 (2005).
 

 [30]
 

 .
 
 State v. Lindsey,
 
 948 So.2d at 107-08 (citations omitted).
 

 [31]
 

 .
 
 State v. Browning,
 
 06-929 (La.App. 5 Cir. 4/11/07), 956 So.2d 65, 72.
 

 [32]
 

 .
 
 See, State v. Lutcher,
 
 96-2378 (La.App. 1 Cir. 9/19/97), 700 So.2d 961,
 
 writ denied,
 
 97-2537 (La.2/6/98), 709 So.2d 731.
 

 [33]
 

 . LSA-C.Cr.P. art. 401.A(3).
 

 [34]
 

 .
 
 State v. Scott,
 
 278 So.2d 121 (La.1973).