MARION F. EDWARDS, Chief Judge.
12Pefendant/appellant, Nathan Pettus (“Pettus”), appeals his conviction for simple robbery in violation of La. R.S. 14:65.
Pettus was charged with simple robbery in 2008 and pled not guilty. On December 2 and 3, 2009, the case was tried before a six-person jury, and they found him guilty as charged. He filed oral motions for new trial and post-verdict judgment of acquittal. The motion for new trial was denied and, subsequently, the trial judge sentenced Pettus to imprisonment at hard labor for seven years to run consecutively with any other sentences currently being served. Pettus appealed.
On first appeal, this Court found, in an error patent review, that the trial judge failed to rule on Pettus’ motion for post-verdict judgment of acquittal.[1] We vacated his sentence and remanded the case to the trial court for a ruling on his motion for post-verdict judgment of acquittal and *587 resentencing, reserving to Pettus his right to appeal from his conviction and sentence in the event that the ruling was adverse to him.
|sOn remand, the trial judge denied Pet-tus’ motion for post-verdict judgment of acquittal. Afterwards, the trial judge sentenced him to imprisonment at hard labor for seven years to run consecutively to the sentence in case No. 09-656. The present appeal follows.
Angel Bougon testified that, on April 23, 2008, she was working at her boutique on the first floor of Old Metairie Village, a strip shopping center at 701 Metairie Road. At approximately 12:40 p.m., a man opened the door of her shop, put a cloth over his face, and started coughing. Mrs. Bougon described him as a stocky white male of average height wearing khaki shorts, a white button-up men’s dress shirt hanging out of his shorts, a white hat, and large sunglasses. She started backing up and told him not to give her whatever he had. As he was approaching the counter, the man said that he had just gotten over bronchitis. The man walked to the side where Mrs. Bougon was standing, coughed again, and said, “Don’t get scared, give me your money.” Mrs. Bougon asked if he was kidding, and he said, “Don’t make me get violent, get the money.” She pointed to her cash register, and the man said, “Well, go get it.” Mrs. Bougon walked to the register, and the man met her there. He said, “Give me your money,” so she opened up the register and gave him the money, which was approximately $250.
The man asked Mrs. Bougon where the rest of the money was, and she replied that that was all she had. The man told her to lift up the cash register drawer, so she removed it and told him that there was no more money. The man hesitated a few moments and said, “Where’s your purse? Get your purse.” When Mrs. Bougon did not respond, the man said, “Don’t make me get violent. Get your purse.” She got to the back door of the store before the man did, and she had almost closed the door, but the man pulled it open and said, “I don’t think so. Get your purse.”
|4Mrs. Bougon’s purse was sitting on a chair across the room, so she told the man, “There’s my purse. Go get it.” The man told her to go get it. She walked over to where her purse was, and the man did also. While the man was engrossed in the purse for a moment, Mrs. Bougon ran out of the back room. She made it to the front door, screaming, and she pushed the door open with her right hand. Mrs. Bougon had the phone in her left hand, which she had picked up before she left the counter to go into the back room. Before she could get out of the store, the man grabbed her hair and pulled her back into the store.
Mrs. Bougon fell on the floor, still screaming, and she was kicking. She saw the contents of her purse on the floor. The man leaned over Mrs. Bougon while she was on the floor, but she did not know why. Afterward, the man got up and left, and Mrs. Bougon got up and ran after him while calling 911. When she ran out of the door, she turned left, which faced Focis Street, and saw the man one store down at the end of the breezeway. By the time Mrs. Bougon got to the end of the breezeway, the man was gone. She stood in the middle of the parking lot while she was on the phone with the 911 operator, screaming and waving her arms to get attention and help. She then saw a black BMW that was backed into a parking place and a person wearing a white shirt and white hat crouched by the rear of the car on the passenger side.
Mrs. Bougon heard a click of the remote that one would use to unlock a car. While crouching, the man circled the car from *588 the passenger side around the back of the car until he reached the driver’s side door. He got into the driver’s side of the car, and quickly drove off. When he left the parking area, he exited on Focis Street and turned left. Mrs. Bougon was able to see the license plate number on the BMW, which she relayed to the 911 operator.
| ¡¡Afterward, Mrs. Bougon went back inside her store where she saw the contents of her purse all over the floor. While she was looking on the floor and wondering why the man was leaning over her and what he might have taken, she saw a syringe, which did not belong to her. Mrs. Bougon later gave a statement to the police. She was shown a photographic lineup, but she could not identify the man who robbed her. Mrs. Bougon explained that she did not get a clear look at the man’s face because he held the cloth over his face during the entire incident.
Michael Sackett testified that, on April 23, 2008, around lunchtime, he was driving his car down Focis Street when he observed a lady (Mrs. Bougon) coming around the corner of the shopping center screaming and waving a phone at a man. Mr. Sackett also saw a man hidden behind the right side of a black BMW. The man’s back was to Mr. Sackett, and the back of the car was facing Mr. Sackett. The lady kept screaming and getting closer to the man hiding by the car. The man was holding his shirt up to hide his face, and he had a key in his hand.
The man opened the door from the passenger side and then slipped into the front of the car, climbed over the console, got into the driver’s seat, and started the car. He never turned around and Mr. Sackett did not see his face. The BMW exited the parking lot and turned left onto Focis Street. Mr. Sackett relayed the license plate number of the BMW to the police and followed the car until it got to the Stewart Building in the 100 block of Veterans Boulevard. The BMW entered the parking lot behind the Stewart Building, and Mr. Sackett parked outside of the building and remained in that position and on the phone with the 911 operator until the police arrived. The BMW did not leave the parking lot while Mr. Sackett waited there, on the shoulder of the street, for the police. Mr. Sackett was familiar with the parking lot, and he would be able to see anyone exiting.
IfiMr. Sackett described the man he saw as a white male wearing a white shirt covering his head, a baseball cap, tennis shoes, and khaki, Bermuda-type shorts that went past his knees. He testified that the man was young, well-built, about 6' or 6'1", and about 170 to 180 pounds. Mr. Sackett gave a statement to the police and was shown a photographic lineup; however, he could not identify anyone because Mr. Sackett never saw the man’s face.
Detective David Mascaro of the Jefferson Parish Sheriffs Office testified that he investigated the robbery. The crime scene was processed, including the syringe found on the floor. After the detective was provided with the license plate number of the black BMW driven by the suspect, he conducted a “computer check,” and learned that it was registered to Tracy Garcia, eventually learning that she was Pettus’ flaneé and the mother of his child. Detective Mascaro testified that Ms. Garcia reported that her BMW had been stolen twenty minutes after the robbery. In accord with Mr. Sackett’s report, the car was ultimately located at the Stewart Enterprises parking lot. The car was secured for evidence, towed, and processed.
Detective Mascaro met with Ms. Garcia, who was staying with a friend just off Metairie Road, at the same address from where she reported that her BMW had been stolen. From that location, Detective *589 Mascaro took Ms. Garcia to the investigations bureau. While en route, Pettus continuously called Ms. Garcia’s cell phone. Pettus then talked to Detective Mascaro over the phone and instructed him not to speak to Ms. Garcia regarding her BMW. When the detective asked Pettus to explain what happened with Ms. Garcia’s vehicle, he replied that he could not because he was in Houston, Texas. Once Detective Mascaro and Ms. Garcia arrived at the detective bureau, they had a conversation, after which he prepared an arrest warrant for Pettus. Ms. Garcia told the detective that Pettus “had the 17vehicle,” and that he was staying with her and her friend at the Metairie Court address.
Detective Mascaro retrieved numerous items from the BMW including a man’s white dress shirt in size XXL; a white tank top T-shirt; two other T-shirts; two cash receipts for purchases at Rite-Aid; assorted handwritten notes; a handwritten prescription in Pettus’ name for Lorcet dated April 21, 2008, three days before the robbery, with an address of 1356 Silvia Street in Metairie, and a prescription in Tracy Garcia’s name for Lorcet with the same date and address; a man’s watch; a pair of brown sunglasses; and a bottle of Distiller’s Row Vodka.
The detective collected the white dress shirt, which was draped across the seat of the BMW, and the white T-shirt because he believed they were used in the robbery, and identified State’s Exhibit 48 as the shirt and the tank top he collected from the vehicle. The victim positively identified the man’s white dress shirt as a shirt that looked similar to the one the robber was wearing. She also positively identified the white tank top, stating that it looked similar to the one the robber had in his hand when he was covering his face.
The first cash receipt, which was from the Rite-Aid on Metairie Road directly across the street from the strip mall where the robbery occurred, showed a purchase of Distiller’s Vodka at approximately 8:30 a.m. on the morning of the robbery. The second receipt, which was from the Rite-Aid in the 700 or 800 block of Veterans Boulevard, showed a purchase of Distiller’s Vodka at 12:22 p.m., approximately twenty minutes before the robbery occurred. The Rite-Aid on Veterans Boulevard was very close to where the BMW was recovered.
Detective Mascaro went to each Rite-Aid and obtained video surveillance, which was played for the jury. With respect to the video obtained from the Rite-Aid on Metairie Road, Detective Mascaro positively identified Pettus entering the | sstore, talking to the cashier, and then exiting the store. He testified that there was a clear shot of Pettus’ face at one point on that video. Detective Mascaro noted that the man in the video was wearing tan or khaki cargo shorts, white tennis shoes, a tan or light-colored cap, and a black shirt.
Detective Mascaro testified that the video obtained from the Rite-Aid on Veterans Boulevard showed Pettus wearing the same shorts and shoes that he observed in the first video, but that Pettus was now wearing a white long-sleeved button-up shirt and sunglasses hanging on the front of the shirt. He further testified that the clothes being worn by Pettus at 12:22 p.m. on the videotape matched the description of the clothing worn by the robber approximately twenty minutes later. The detective explained that the Rite-Aid clerk at the Veterans store recalled Pettus because she had a detailed conversation with him as he purchased the vodka. The clerk remembered that Pettus told her he had just found out that his girlfriend was pregnant and that he was covering his mouth because he had a toothache. Detective Mascaro asserted that it took approximately five minutes to drive from the Rite-Aid *590 on Veterans Boulevard to the 700 block of Metairie Road where the robbery occurred.
Pettus was arrested in Houston in July 2008. After obtaining a search warrant for his body, Detective Mascaro also had a crime scene technician obtain a buccal swab from Pettus for DNA testing. Sarah Corrigan, an expert forensic DNA analyst, testified that the wash from the syringe was compared to the buccal swab taken from Pettus, and it was consistent with a partial profile; therefore, he could not be excluded as a donor. Ms. Corrigan further testified that they were able to identify “four of the 13 markers.” She stated that, for the four of the thirteen markers tested, the genetic profile made from the wash of the syringe occurred with a frequency of approximately one in 33,000 persons of the |9Caucasian population, one in 250,000 persons of the African-American population, and one in 47,000 persons of the Hispanic population.
Additionally, Detective Mascaro instructed the crime scene technician to try and obtain fingerprints from the rear passenger side of the BMW where the suspect was seen crouching and from the pint-sized bottle of vodka found on the passenger side floorboard in the BMW. Aisha Prudhomme, a fingerprint expert, testified that two prints were obtained from the exterior passenger side door window of the BMW (the right middle finger and the right ring finger) and that the left middle fingerprint was obtained from the vodka bottle found inside the BMW, and all of them belonged to Pettus. No usable prints were obtained from the crime scene.
Pettus argues that the evidence was insufficient to support the conviction.

ISSUES ON APPEAL

On appeal, Pettus contends that he was convicted without anyone identifying him as the perpetrator and his conviction was based upon circumstantial evidence that failed to exclude several reasonable hypotheses of innocence.
In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt.[2] Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts.[3]
The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every | ^reasonable hypothesis of innocence.[4] The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.[5]
*591 The elements necessary to sustain a conviction of simple robbery are: 1) the taking of anything of value; 2) belonging to another; 3) from the person of another; 4) by use of force or intimidation.[6] Here, Pettus does not contend the State failed to prove the elements of the crime; rather, he contends that his identity as the perpetrator was not proven beyond a reasonable doubt.
In his brief, Pettus notes that Ms. Garcia reported her car stolen twenty minutes after the robbery, contending that the individual who stole the car could have committed the robbery. He urges that no physical evidence conclusively proved he was the robber and states that the DNA found on the syringe was not proof beyond a reasonable doubt that the syringe belonged to him. According to Pettus, the fingerprints found on the car and on the vodka bottle only proved he had access to the car at some time, which was not surprising given that his girlfriend was the car’s owner. He points out that it was not conclusively proven that he was the person in the Rite-Aid stores and that the receipts found in the car could have belonged to the person who stole the car. He asserts that the person who stole the car could have used the clothing in the car to commit the robbery.
Inin connection with the sufficiency issue, we consider another assignment of error. There, Pettus also argues that the trial judge erred by denying his request to display his tattoo to the jury, which denied him the right to present a defense. He contends that, because identification was the key issue for the jury’s determination of guilt, the fact that none of the witnesses observed a tattoo on the perpetrator was relevant and material to his guilt or innocence.
The State must prove the defendant’s identity as the perpetrator in addition to proving the statutory elements of the charged offense at trial.[7] As a general rule, when the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification.[8]
After the State’s witnesses testified, defense counsel informed the trial judge that he wanted Pettus to display the tattoo on his arm to the jury. He argued that the tattoo was highly relevant because no one identified Pettus as the perpetrator and pointed out that none of the witnesses testified that they saw a tattoo on Pettus, even though, in one of the videos, the suspect was wearing a black short-sleeved shirt when he was leaning against the counter by the cashier. The State replied that the victim testified that she did not observe any tattoos, and the surveillance video from Rite-Aid showed that Pettus was wearing a long-sleeved white shirt, which the victim positively identified as the shirt worn by the robber. The State contended that there was no evidence presented in this case as to the existence of tattoos on Pettus’ body and how long he had them; therefore, there was no foundation to allow the tattoo to be shown. Lastly, the State argued that it had filed a motion for discovery, yet the defense had not shown them a tattoo prior to trial.
11?In making his determination, the trial judge said he had read the case of State v. *592 Martin,[9] relied upon by the defense, and distinguished it. The trial judge then said he was not going to allow the jury in the instant case to view the tattoo, stating, “In this case, there is no identification, and as such, it’s not relevant, because nothing was ever put in to make it relevant, as to whether or not he had a tattoo, which would distinguish Martin from this particular case.”
Afterward, the trial judge allowed defense counsel to proffer the tattoo as Defense Proffer I. Defense counsel asked Pettus to stand up and roll up the sleeve on his right arm. Pettus complied, and defense counsel proceeded to describe the tattoo, which read, “F..k you,” was two to three finger-lengths from Pettus’ wrist and three finger-lengths from his elbow on the back side, and not on the inside of his forearm. The trial judge observed that it was not bold lettering, and, from a distance, he could tell there was some ink on there, but he could not make out what it was, saying that it was not a very distinct tattoo. Defense counsel described it as having a cursive nature, not print, but not bound together. The trial judge agreed with the prosecutor that Pettus had dark hair on his arms, and the prosecutor stated that the hair covered the tattoo.
After he was convicted, Pettus filed a motion for new trial and a motion for post-verdict judgment of acquittal arguing that the trial judge erred by not allowing him to display his tattoo to the jury. The trial judge denied the motion for new trial, again distinguishing the instant case from State v. Martin. The judge explained that, in the instant case, there was never any suggestion that a tattoo existed, and there was no identification, unlike in Martin where the victim gave a tattoo description in her identification. The trial judge also explained that, in the |13instant case, the victim did not have enough time to look at anybody, unlike in Martin where the rape victim viewed her attacker for over an hour.
Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401. All relevant evidence is admissible, except as otherwise provided by law, and irrelevant evidence is not admissible. La. C.E. art. 402. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. La. C.E. art. 403. Relevancy and the admissibility of evidence are within the sound discretion of the trial court and its ruling will not be disturbed on appeal, absent a clear abuse of discretion.[10]
In the instant case, Pettus’ identification was the primary issue because no one positively identified him as the robber and the case against him was circumstantial. Therefore, it would have been relevant if he had a tattoo on his right forearm at the time of the robbery that was not, but could have been, seen by the victim during the robbery.
However, we find that the trial judge did not err by denying Pettus’ request to show his tattoo to the jury, because, unlike Martin, the defense did not lay the proper foundation. There was no evidence introduced at trial that showed Pettus had the tattoo in question at the time of the rob *593 bery, or that the tattoo would have been reasonably visible or noticeable by the victim.
Detective Mascaro testified at trial that he was aware that Pettus had a tattoo of a phrase on his upper arm, although he did not take note of or observe any tattoo on his forearms. However, none of the witnesses, including Detective Mascaro, 114testified as to what that tattoo on his upper arm depicted or said, when Pettus acquired that tattoo, or whether he had it at the time of the robbery.
Unlike Martin, the victim did not put the existence of the tattoo at issue nor did Pettus demonstrate, at trial, the relevance of the tattoo in connection with his identity as the perpetrator.
Bougon testified that she did not see any identifying marks on the suspect such as tattoos or cuts. However, it was never proven whether the tattoo would have been reasonably visible to or noticeable by her. Defense counsel asked Bougon if she recalled telling the officer that the suspect was wearing a short-sleeved shirt, and the victim replied, “He had — it wasn’t a full long-sleeve shirt.” When the prosecutor asked her whether it was the type of shirt where the sleeves could be rolled up, she responded, “Right.” The still photograph taken from the Rite-Aid videotape twenty minutes before the robbery, State’s Exhibit 45, showed a white male wearing a long-sleeved white shirt with the sleeves covering his arms. Although the victim consistently testified that the robber was wearing a white shirt, and she identified State’s Exhibit 48 as looking similar to the shirt the robber wore, the victim never fully explained at trial exactly how short the sleeves were on that shirt, whether or not the sleeves were rolled up, and if so, how high, or whether she could see Pettus’ right forearm during the robbery.
After listening to the testimony and considering the evidence, the jury clearly believed that Pettus committed the robbery and rejected the alternative hypothesis of innocence. The credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of |1Rany witness; therefore, the credibility of witnesses will not be reweighed on appeal.[11]
 In light of the foregoing, we find that a rational trier of fact could have found that the evidence presented by the State, although circumstantial, was sufficient to prove Pettus’ guilt beyond a reasonable doubt. Further, the possible alternative hypothesis offered by Pettus, i.e., that another individual stole the car and committed the robbery, is not sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. We find it highly unlikely that Pettus drove his girlfriend’s car the day of the robbery, purchased vodka at the Rite-Aid twenty minutes before the robbery wearing the same clothes as the perpetrator, and, in the interim between that time and the time the robbery occurred, someone stole the car, robbed the victim while wearing Pettus’ clothes, and dropped a syringe with his partial DNA at the crime scene. In brief, Pettus also incorrectly contends that the only evidence presented by the State was the hearsay statement of Tracy Garcia (that Pettus had her car) elicited during Detective Mascaro’s testimony, which testimony should not have been admitted. This hearsay issue was not properly preserved for appeal since defense counsel failed to object at the time the testimony was offered and, thus, we decline to address it.
*594 In summary, we find that the trial court properly excluded the tattoo evidence, and, further, that a rational trier of fact could have found the evidence presented by the State, although circumstantial, was sufficient to prove Pettus’ guilt beyond a reasonable doubt, excluding every reasonable hypothesis of innocence. These assignments of error are without merit.
 | ^Finally, we consider the first assignment of error, that is, that the trial court violated Pettus’ right to counsel by denying his motion for continuance to hire private counsel. Alternatively, he argues that the trial judge erred by denying his request to reopen the motions so that his hired, chosen counsel could litigate on his behalf. Pettus contends that the request for continuance was made at a reasonable time (soon after his last attorney withdrew), in a reasonable manner (a request for a two-week continuance), and at an appropriate stage in the proceedings (prior to trial).
The record shows that an attorney was appointed to represent Pettus at his arraignment. On October 24, 2008, the motion hearing was continued to November 21, 2008, “to name attorney.” James A. Williams appeared on Pettus’ behalf on November 21, 2008, and he requested a continuance that was granted. The hearing was re-set for January 23, 2009. On that date, Pettus did not appear for the motion hearing, and an attachment was issued for his arrest.
An unsigned pleading in the record indicates that Calvin Fleming was appointed as counsel on March 6, 2009, and the minute entry for that date indicates that Pet-tus appeared for a motion, but Mr. Fleming was not present. The motion hearing was continued again to March 9, 2009.
On March 9, 2009, Pettus was found guilty of contempt of court and sentenced to six months in parish prison. Also on March 9, 2009, Mr. Fleming filed omnibus motions on behalf of Pettus. On March 11, 2009, Mr. Williams filed a motion to withdraw stating that he was not retained by Pettus to represent him and that motion was granted the next day.
On April 27, 2009, Pettus and his counsel, Calvin Fleming, appeared for the hearing on the motion to suppress the evidence. Mr. Fleming informed the trial judge that Pettus intended to hire private counsel and wanted to have the hearing |17on the motion to suppress evidence continued. The trial judge stated that Pettus had said that the last time they were there, to which Pettus replied that the attorney wanted a certain amount for a retainer which he would be able to obtain within the next two weeks.
The court decided to go forward with the motions that day, adding that, if Pettus had counsel hired that day, the court probably would have continued the motions. However, the trial judge said he was not going to continue the hearing because Pet-tus had “counsel listed of record” who was prepared. Pettus asked whether his new counsel would be able to file a motion to suppress, and the trial judge said not unless that counsel raised a new issue for consideration. The trial judge stated that he could not stop Pettus’ new counsel from filing a motion to reconsider, but they were going to proceed with the hearing on the motion to suppress. After hearing testimony and considering the evidence, the court denied the motion to suppress the evidence. On May 11, 2009, Juan La-badie filed a motion to enroll as attorney of record stating that he had been retained by Pettus to represent him.
Trial, which had been set for June 22, 2009, was continued at Mr. Labadie’s request to August 17. A motion hearing, which had previously been set, was contin *595 ued, again at the request of Mr. Labadie, and re-set for the day of trial. Trial was re-set twice more at Mr. Labadie’s request. Defense counsel filed a motion to re-urge motions on behalf of Pettus on December 1, 2009, the day before trial was set to begin. Mr. Labadie argued that Pettus was made to go forward with motions with an attorney that was not of his choosing and that the proper procedures were not followed in appointing the public defender. The motion was denied. The record shows that Mr. Labadie represented Pettus throughout the remainder of the case, both at trial and at the sentencing hearing.
11sGenerally, a criminal defendant has the right to counsel of his choice.[12] The defendant’s right to choose an attorney is a right to be exercised at a reasonable time, in a reasonable manner, and at an appropriate stage within the procedural framework of the criminal justice system.[13] There is no constitutional right to make a new choice of counsel on the very date the trial is to begin, with the attendant necessity of a continuance and its disrupting implications to the orderly trial of cases.[14] In addition, the Louisiana Supreme Court generally declines to reverse convictions even on a showing of an improper denial of a motion for a continuance absent a showing of specific prejudice.[15]
La.C.Cr.P. art. 707 states that a motion for a continuance shall be filed in writing at least seven days prior to the commencement of trial, and shall allege specifically the grounds upon which it is based. When made by a defendant, it must be verified by his affidavit or that of his counsel. Upon written motion at any time and after contradictory hearing, the court may grant a continuance, but only upon a showing that such motion is in the interest of justice. The Official Comments to this article state that it is applicable to motions for continuance with respect to other matters. The granting of a continuance is discretionary on the part of the trial judge.[16] The denial of a motion for continuance is not grounds for reversal absent abuse of discretion and a showing of specific prejudice.[17]
In the instant case, Pettus had more than six months between the time he was arraigned and the date set for the hearing on the motion to suppress to retain other counsel. Further, Pettus’ appointed counsel did not advise the trial judge that he 119was unprepared to represent him. Additionally, Pettus had previously retained other counsel, Mr. Williams, who had already been given a continuance. Pettus had not yet retained other counsel on the morning of the hearing, and, finally, he has not made a showing of specific prejudice. We also note that his trial counsel did not file the motion to re-urge until the day before trial, more than six months after he was enrolled as counsel of record.
Under these circumstances, we find that the trial judge did not abuse his discretion *596 in denying the motion for continuance or in denying the motion to re-open the motion hearing.
The record discloses no errors patent in the present matter.
For the foregoing reason, the verdict and sentence are affirmed.

AFFIRMED

. State v. Pettus, 10-742 (La.App. 5 Cir. 5/24/11), 66 So.3d 1192.

. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).

. State v. Mitchell, 08-136, p. 11 (La.App. 5 Cir. 1/13/09), 7 So.3d 720, 728.

. La. R.S. 15:438.

. State v. Mitchell, 99-3342, p. 7 (La. 10/17/00), 772 So.2d 78, 83; State v. Washington, 03-1135, p. 4 (La.App. 5 Cir. 1/27/04), 866 So.2d 973, 977.

.La. R.S. 14:65; State v. Jones, 00-190, p. 6 (La.App. 5 Cir. 7/25/00), 767 So.2d 808, 810, writs denied, 00-2449 (La.6/22/01), 794 So.2d 782 and 00-2493 (La.6/22/01), 794 So.2d 783.

. State v. Mitchell, supra.

. Id.

. 519 So.2d 87 (La.1988).

. State v. Hills, 03-716, p. 11 (La.App. 5 Cir. 12/9/03), 866 So.2d 278, 285, writ denied, 04-1322 (La.4/22/05), 899 So.2d 569.

. State v. Macon, 06-481, pp. 7-8 (La.6/1/07), 957 So.2d 1280, 1285-86; State v. Rowan, 97-21, p. 7 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.

. State v. Woods, 09-399, p. 24 (La.App. 5 Cir. 3/9/10), 38 So.3d 391, 410, writ denied, 10-784 (La. 10/29/10), 48 So.3d 1096 (citing State v. Reeves, 06-2419, p. 37 (La.5/5/09), 11 So.3d 1031, 1057, cert. denied, - U.S. -, 130 S.Ct. 637, 175 L.Ed.2d 490 (2009)).

. State v. Wilson, 09-108 (La.App. 5 Cir. 12/29/09), 30 So.3d 149, 153.

. Id.

. Id. (citing State v. Reeves, supra).

. La.C.Cr.P. art. 712; State v. Kelly, 96-903, p. 16 (La.App. 5 Cir. 11/12/97), 704 So.2d 800, 807-08, writ denied, 97-3104 (La.4/9/98), 717 So.2d 1142.

. Id.